[No. A060848. First Dist., Div. Three. June 2, 1994.]

In re STEVEN S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
STEVEN S., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with exception of parts IV and V.

## COUNSEL

Jean Allan, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Clifford K. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### CHIN, J.—

#### I. INTRODUCTION

This appeal challenges the constitutionality of a statute making it a crime to burn a cross on the private property of another for the purpose of terrorizing the owner or occupant or in reckless disregard of that risk. We uphold the statute, concluding it is neither overbroad nor vague, is not an impermissible content-based prohibition on speech, and does not violate equal protection.

#### II. FACTS AND PROCEDURE

Steven S. participated in an incident of cross burning involving two sets of neighbors—the Fosters and the Hepburns—in the Humboldt County town of Manila.

Ernest Foster is African-American. His wife, Leanna Foster, is White. They lived next door to Jerry and Tina Hepburn, a fence separating their houses. The Fosters and Hepburns were on good terms; they occasionally socialized and babysat for each others' children.

On the afternoon of September 13, 1991, which was a Friday, the Hepburns had four visitors: Ed Pratt, John Branson, 16-year-old Steven S., and

another teenager named Steven C. Someone suggested playing a Friday the 13th joke on the Fosters. The two teenagers—with assistance from the Hepburns' six-year-old son Buck—filled a paper bag with dog feces, and one of them placed it on the Fosters' porch and set it on fire. Responding to a knock at her door, Leanna Foster emerged in a panic and put out the fire while the pranksters watched and laughed.

Next, Jerry Hepburn telephoned a restaurant and ordered pizza for delivery to the Fosters. The deliveryman did not appear until after the cross burning.

Branson arrived at the Hepburn residence following the dog feces incident. Told of the prank, he said, "Let's play a joke on the black man," and he suggested, "You can burn a cross." Everyone present, including Steven S., responded with enthusiasm.

Steven S., Steven C., and Buck built a cross with wood and nails. The two teenagers placed the cross in the Fosters' yard just past the fence and doused it with charcoal lighter fluid. One of them set it on fire. Pratt telephoned the Fosters and told Ernest, "Something is burning in your yard." The Fosters looked out a window and saw the burning cross, and Ernest summoned the police.

Leanna was extremely frightened by the cross burning, taking it as a threat to her life. For three days she spoke to nobody and, except for a short trip to a market, stayed in her house with the curtains closed. She was afraid to answer the telephone for fear of threats by the perpetrator.

The Hepburns eventually apologized to the Fosters for the incident, and the families resumed neighborly relations. The Hepburns claimed the cross burning was merely a practical joke and was not racially motivated.

Steven S. had previously been declared a ward of the court (Welf. & Inst. Code, § 602) and had been placed on probation. An amended petition alleged he burned or desecrated a cross in violation of Penal Code section 11411, subdivision (c),[1] and violated his probation.[2] The court found the allegations were true and retained Steven as a ward. The court placed him on

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]The amended petition also alleged Steven had committed an assault and battery in an unrelated incident on September 28, 1992. The prosecutor dropped those charges because the victim was unavailable. Steven had a history of other assaultive behavior, including an incident on June 24, 1992, in which he called a man "faggot" and punched him in the face.

probation with the condition that he serve 160 days in juvenile hall, with 120 days suspended and the last 15 days on outside work service.[3]

## III. The Constitutional Issues

### A. *The Statute*

Section 11411, enacted in 1982, proscribes various acts of racial, ethnic, and religious terrorism. Subdivision (c) of the statute provides, "Any person who burns or desecrates a cross or other religious symbol, knowing it to be a religious symbol, on the private property of another without authorization for the purpose of terrorizing the owner or occupant of that private property or in reckless disregard of the risk of terrorizing the owner or occupant of that private property" is guilty of a crime, which may be prosecuted as a misdemeanor or a felony. Subdivision (d) defines " 'terrorize' " as "to cause a person of ordinary emotions and sensibilities to fear for personal safety." (§ 11411, subd. (d).)

Underlying the statute is a codified legislative declaration that "it is the right of every person regardless of race, color, creed, religion or national origin, to be secure and protected from fear, intimidation, and physical harm caused by the activities of violent groups and individuals." (§ 11410.) A Senate Judiciary Committee report states, "The purpose of this bill is to curb Ku-Klux-Klan type violence." (Sen. Com. on Judiciary Analysis of Sen. Bill No. 267 (1981-1982 Reg. Sess.) as amended Mar. 16, 1981, p. 2.)

Steven asserts multiple constitutional challenges to section 11411. He contends it is overbroad both facially and as applied, is an impermissible content-based prohibition on speech, is void for vagueness, and denies equal protection.

### B. *Basic Concepts*

We begin by placing the constitutional issues in their proper context. ▮ The conduct that subdivision (c) of section 11411 proscribes is not pure speech, but expressive conduct. Cross burning conveys a message—the Ku Klux Klan's creed of racial hatred.[4] As such, it implicates the First Amendment's guarantee of freedom of speech. (*R.A.V.* v. *St. Paul* (1992) 505

---

[3]Steven C. was prosecuted in the same proceeding; the court sustained his petition, and he did not appeal. John Branson is scheduled to go to trial on July 11, 1994, also for violating section 11411, subdivision (c). Ed Pratt and the Hepburns have not been prosecuted.

[4]Cross burnings were not part of Klan ritual during Reconstruction, but were begun in 1915 by a Klan revivalist who was inspired by the film The Birth of a Nation. The film was based on a 1904 novel which included the author's entirely imagined description of a Reconstruc-

U.S. __, __-__ [120 L.Ed.2d 305, 323-325, 112 S.Ct. 2538]; *Texas* v. *Johnson* (1989) 491 U.S. 397, 404-406 [105 L.Ed.2d 342, 353-355, 109 S.Ct. 2533].)

But an *unauthorized* cross burning *on another person's property*, which we shall call "malicious" cross burning for shorthand purposes, as distinguished from a ritual cross burning at a Klan gathering, does more than convey a message. It inflicts immediate injury by subjecting the victim to fear and intimidation, and it conveys a threat of future physical harm.

Leanna Foster's testimony at Steven's jurisdictional hearing provides a vivid description of the effects of a malicious cross burning on its victim. She said that the incident caused her to feel "[s]cared out of my life" and threatened with vengeance (presumably for her marriage to an African-American): "To my understanding a cross burning means the KKK. They're the ones that invented it. It's vengeance if anything, they symbolize to do that for hate [*sic*] and when they burn crosses on people's yards it's a threat to their life. I took it as a threat to my life . . . ."

 Because of its dual effects, a malicious cross burning implicates two doctrines that may remove certain speech and expressive conduct from the scope of the First Amendment. The first is the "'true' threat" doctrine, under which threats of violence may be punished without infringing the First Amendment. (*Watts* v. *United States* (1969) 394 U.S. 705, 707-708 [22 L.Ed.2d 664, 666-667, 89 S.Ct. 1399].) A true threat occurs when a reasonable person would foresee that the threat would be interpreted as a serious expression of intention to inflict bodily harm. (*U.S.* v. *Orozco-Santillan* (9th Cir. 1990) 903 F.2d 1262, 1265-1266.) The second is the "'fighting' words" doctrine, which permits punishment for statements "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." (*Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568, 572 [86 L.Ed. 1031, 1035, 62 S.Ct. 766], fn. omitted.)[5] Both doctrines are limited by a rule recently announced by the United States Supreme Court in *R.A.V.* v. *St. Paul, supra,* 505 U.S. __ [120 L.Ed.2d 305], which generally prohibits speech regulation that discriminates on the basis of content.

### C. *True Threat*

 Steven first contends the challenged statute is not within the scope of the true threat doctrine, and is facially overbroad, because it applies not only

---

tion-era Klan cross burning, drawn from the Scottish use of burning crosses as signal fires. (Wade, The Fiery Cross: The Ku Klux Klan in America (1987) pp. 140-146; see Dixon, The Clansman (1904) pp. 324-326.)

[5]Some courts have treated threats as fighting words. (See *U.S.* v. *McDermott* (N.D.Iowa 1993) 822 F.Supp. 582, 590-591, and cases cited therein.)

where a perpetrator of a malicious cross burning has a "purpose of terrorizing" the victim, but also where the perpetrator acts "in reckless disregard of the risk of terrorizing" the victim. (§ 11411, subd. (c).) According to Steven, a true threat requires intent to terrorize—that is, in the context of the statute, intent "to cause a person of ordinary emotions and sensibilities to fear for personal safety." (§ 11411, subd. (d).)

No such intent requirement appears in the cases prescribing and interpreting the true threat doctrine. The leading case, *Watts* v. *United States, supra*, 394 U.S. at pages 707-708 [22 L.Ed.2d at pages 666-667], confirmed the facial constitutionality of a statute making it a crime to threaten the President (18 U.S.C. § 871) without deciding whether the perpetrator must have intended to carry out the threat.[6] Subsequent decisions have established an objective standard for determining whether there is a true threat: "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. [Citations.]" (*U.S.* v. *Orozco-Santillan, supra*, 903 F.2d at p. 1265; accord, e.g., *U.S.* v. *Mitchell* (9th Cir. 1987) 812 F.2d 1250, 1255; *United States* v. *Merrill* (9th Cir. 1984) 746 F.2d 458, 462.) The only intent requirement is that the offender intentionally or knowingly made a communication that a reasonable person would construe as a threat. (*Orozco-Santillan, supra*, 903 F.2d at p. 1265, fn. 3; *State* v. *Kepiro* (1991) 61 Wn.App. 116, 124-126 [810 P.2d 19, 24].)[7]

In the present context, the objective standard developed in the wake of *Watts* excludes any constitutional requirement of intent to terrorize. For a true threat to exist, it is enough that a reasonable person would foresee that a victim would construe a malicious cross burning as a serious expression of intent to do harm—which is surely true. That is sufficient to bring the act within the scope of the true threat doctrine; the only required intent is that the offender intentionally or knowingly burned the cross.

### D. *Fighting Words*

■ Steven's briefs do not discuss whether malicious cross burning is within the scope of the fighting words doctrine. We conclude it is.

---

[6]The court held that the statement in that case—" 'If they ever make me carry a rifle the first man I want to get in my sights is L. B. J.' "—was political hyperbole rather than a true threat, given its context and expressly conditional nature. (*Watts* v. *United States, supra*, 394 U.S. at pp. 706, 708 [22 L.Ed.2d at pp. 666, 667].)

[7]Steven relies on *State* v. *Miller* (1981) 6 Kan.App.2d 432, 435 [629 P.2d 748, 751], where the court said that for a malicious cross burning to be a statutorily proscribed "terroristic threat," the threat "must be communicated with the intent to terrorize another." The court, however, based that statement on the requirements of the state statute involved in that case, not the constitutional requirements of the true threat doctrine. (*Id.*, at pp. 434-436 [629 P.2d at pp. 750-751].)

In the present context, the term "fighting words" is doubly a misnomer. The typical act of malicious cross burning is not done in the victim's immediate physical presence and thus does not tend to incite an immediate fight, and the act is a matter of expressive conduct rather than an utterance of words. But these distinctions are inconsequential. Despite its name, the fighting words doctrine encompasses expressive conduct that by its very commission inflicts injury. (*Chaplinsky* v. *New Hampshire, supra,* 315 U.S. at p. 572 [86 L.Ed. at p. 1035]; see *R.A.V.* v. *St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 352] (conc. opn. of Stevens, J.).) A malicious cross burning in the yard of one's home is surely a terrifying experience, subjecting the victim to fear and intimidation. By its very commission it inflicts immediate injury. Just ask Leanna Foster.

The key element here is the commission of the act, without authorization, on another person's private property—the element that makes the act, in our shorthand term, *malicious* cross burning. A cross burning at a Ku Klux Klan rally is constitutionally protected (see *Brandenburg* v. *Ohio* (1969) 395 U.S. 444 [23 L.Ed.2d 430, 89 S.Ct. 1827]) because it is not directed at any individual. (*R.A.V.* v. *St. Paul, supra,* 505 U.S. at pp. __, __ [120 L.Ed.2d at pp. 350, 352] (conc. opn. of Stevens, J.).) Expressive conduct that merely causes "hurt feelings, offense, or resentment" does not amount to fighting words. (*Id.,* at p. __ [120 L.Ed.2d at p. 338] (conc. opn. of White, J.).) But the act we call malicious cross burning *is* directed at individuals—here, the Fosters—and it goes far beyond hurt feelings, offense, or resentment. It causes terror in specific victims. That aspect brings the conduct within the scope of the fighting words doctrine.

### E. *Overbreadth*

■ Our analysis of the true threat and fighting words issues disposes of Steven's claim that section 11411, subdivision (c), is facially overbroad—i.e., that it "may cause others not before the court to refrain from constitutionally protected speech or expression." (*Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 612 [37 L.Ed.2d 830, 840, 93 S.Ct. 2908].) Again, the key factor is that the statute applies only to unauthorized conduct on the private property of another person—whether it be cross burning or the desecration of some "other religious symbol." (§ 11411, subd. (c).) This restricts the sweep of the statute to offenders who subject a specific victim to an expressive act that a reasonable person would construe as a threat and that by its very commission inflicts injury—i.e., to true threats and fighting words.

Steven also claims the statute is overbroad as applied to him because he did not harbor intent to terrorize but was only charged, and found to have

acted, with "reckless disregard of the risk of terrorizing." (§ 11411, subd. (c).) This argument fails because of our conclusion that the true threats doctrine requires only intent to perform the act, not intent to terrorize.

### F. Content-based Discrimination

We come now to *R.A.V. v. St. Paul, supra,* 505 U.S. __ [120 L.Ed.2d 305], a 1992 decision in which the United States Supreme Court announced a limitation on all regulation of speech and expressive conduct, including the true threat and fighting words doctrines. ▮ Steven contends *R.A.V.* makes section 11411, subdivision (c), unconstitutional.

*R.A.V.* was a cross burning case. But unlike section 11411, the legislation in *R.A.V.*—a city ordinance—proscribed *any* cross burning, not just an unauthorized cross burning on another person's private property. The ordinance provided, " 'Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.' " (*R.A.V. v. St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 315].) The particular defendant in that case had burned a cross in an African-American family's yard. (*Ibid.*)

The United States Supreme Court invalidated the ordinance, which the Minnesota Supreme Court had concluded reached only unprotected fighting words (*R.A.V. v. St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 316]), as unlawfully discriminating on the basis of content. According to the high court, its previous statements that the Constitution does not protect certain categories of expression were not to be taken literally, but meant only that "these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content." (*Id.,* at p. __ [120 L.Ed.2d at p. 318], original italics.) ▮ Thus, while certain categories of speech and expressive conduct may be regulated, such regulation may not discriminate *within that category* on the basis of content. For example, "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." (*Ibid.,* original italics.) The ordinance in *R.A.V.* was *facially* unconstitutional as content-based discrimination because it discriminated among fighting words based on race, color, creed, religion, or gender. ( *Id.,* at p. __ [120 L.Ed.2d at p. 323].)

*R.A.V.* also, however, prescribed three exceptions to the rule announced.

First, content-based discrimination is valid "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable . . . ." (*R.A.V.* v. *St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at pp. 320-321].) For example, a state may prohibit only such obscenity as is the most patently offensive in its prurience—the very reason obscenity is proscribable—but may not proscribe only obscenity that includes offensive political messages. (*Id.,* at p. __ [120 L.Ed.2d at p. 321].)

Second, content-based discrimination against a subclass is permissible when the subclass "happens to be associated with particular 'secondary effects' of the speech," so that the regulation is justified without reference to the speech's content. (*R.A.V.* v. *St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 321].) "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." (*Id.,* at p. __ [120 L.Ed.2d at p. 322].) Thus, for example, a state may impose a zoning restriction on adult motion picture theaters because the restriction targets urban blight, which is a secondary effect of such theaters. (*Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41, 47-48 [89 L.Ed.2d 29, 37-38, 106 S.Ct. 925].)

Third, content-based discrimination is permissible when "the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." (*R.A.V.* v. *St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 322].)

The present case differs fundamentally from *R.A.V.* Although the particular defendant in *R.A.V.* had burned a cross in a family's yard, the ordinance itself applied to *any* cross burning, not just the act we call *malicious* cross burning. The decision was based on *facial* unconstitutionality; the court was not concerned with the victimizing act actually committed in that case. Here, in contrast, the challenged statute applies *only* to an unauthorized cross burning on another person's private property. That distinction invokes all three of the exceptions set forth in *R.A.V.*

First, our Legislature has made clear in its declaration of the intent underlying section 11411, subdivision (c), that the bases of the statute's content discrimination are the protection of specific victims of malicious cross burning from immediate injury through infliction of fear and intimidation and from the threat of physical harm. (§ 11410.) These are the very reasons the entire classes of speech at issue—fighting words and true threats—are proscribable.

The court in *R.A.V.* noted that "the reason why fighting words are categorically excluded" from First Amendment protection is that "their content embodies a particularly intolerable (and socially unnecessary) *mode* of expressing *whatever* idea the speaker wishes to convey. St. Paul has not singled out an especially offensive mode of expression—it has not, for example, selected for prohibition only those fighting words that communicate ideas in a threatening (as opposed to a merely obnoxious) manner." (*R.A.V.* v. *St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 324], original italics.) Here, our Legislature *has* singled out an especially offensive mode of expression: not any cross burning, which *R.A.V.* calls "merely obnoxious," but a "threatening" cross burning on a victim's private property.

Second, the statute targets secondary effects of malicious cross burning—the infliction, upon a specific victim, of immediate fear and intimidation and a threat of future harm—rather than the racist message conveyed. The ordinance in *R.A.V.* targeted any cross burning that " 'one knows or has reasonable grounds to know arouses anger, alarm or resentment . . . .' " (*R.A.V.* v. *St. Paul, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 315].) *R.A.V.* explained that mere " 'anger, alarm or resentment' " is only an emotive reaction, which does not constitute a secondary effect. (*Id.,* at p. __ [120 L.Ed.2d at p. 325].) In contrast, the fear and intimidation of the victim of a malicious cross burning crosses the line between emotive reaction and tangible injury.

Third, there is no realistic possibility that official suppression of ideas is afoot. In its declaration of intent, the Legislature has assured us, "It is not the intent of this chapter to interfere with the exercise of rights protected by the Constitution of the United States. The Legislature recognizes the constitutional right of every citizen to harbor and express beliefs on any subject whatsoever and to associate with others who share similar beliefs." (§ 11410.) Even without this declaration, it is evident that the expressive element of an unauthorized cross burning on another person's property is incidental at best. At its core, this is an act of terrorism that inflicts pain on its victim, not the expression of an idea.[8]

Thus, we conclude that although section 11411, subdivision (c), discriminates against malicious cross burning on the basis of content, *R.A.V.* permits

---

[8]Other post-*R.A.V.* cases deciding the facial validity of state legislation against cross burning have produced mixed results. In *State* v. *Talley* (1993) 122 Wn.2d 192, 198, 207-209 [858 P.2d 217, 220, 225-227], the Washington Supreme Court upheld a portion of a statute proscribing cross burning that "places another person in reasonable fear of harm to his person or property," concluding that all three of the *R.A.V.* exceptions applied. In *State* v. *Ramsey* (S.C. 1993) 430 S.E.2d 511, 514, the South Carolina Supreme Court invalidated a statute proscribing cross·burning in a public place *or* on another person's property without permission. Likewise, in *State* v. *Sheldon* (1993) 332 Md. 45 [629 A.2d 753, 763], the Maryland Court of Appeals (that state's highest court) invalidated a statute proscribing nonconsensual

such discrimination. We reach the same conclusion regarding the statute's reach to the desecration of "other religious symbol[s]." (§ 11411, subd. (c).) Given the passion with which people have embraced religious beliefs throughout history, desecration of a religious symbol can be uniquely incendiary and even fearsome. (See fn. 9, *post*, this page.) An unauthorized desecration of any "other religious symbol" on the property of another can have the same effects as a malicious cross burning, and thus likewise invokes the exceptions set forth in *R.A.V.*

### G. *Vagueness*

██ Next, Steven contends section 11411, subdivision (c), is unconstitutionally vague. ██ To survive this challenge, the statute must (1) provide sufficient notice to the citizenry as to what is prohibited, (2) provide explicit standards to those who must enforce the statute, and (3) be sufficiently precise to avoid a potentially inhibiting effect on speech. (*People* v. *Mirmirani* (1981) 30 Cal.3d 375, 382-383 [178 Cal.Rptr. 792, 636 P.2d 1130].)

██ The statute is implicated when a person "burns or desecrates a cross or other religious symbol . . . ." (§ 11411, subd. (c).) Steven focuses on the words "desecrates" and "religious symbol." He argues that, given the highly individualized, abstract, and subjective nature of religious belief, nearly any object can be claimed by a believer to be a religious symbol, and nearly any act can be construed by the believer as a desecration.

The point has merit. An act might seem completely innocuous to a nonbeliever, yet deeply offend, and even frighten, the believer. To some, merely touching a simple religious object can be a desecration.[9]

But the act of desecrating a religious symbol is only half the statutory equation. The statute also requires specific mental states, bringing it back from the precipice of unconstitutional vagueness: the offender must *know* that the desecrated object is a religious symbol, and must have acted for the *purpose* of terrorizing or in *reckless disregard* of that risk. (§ 11411, subd. (c).) These elements clarify what is prohibited. The subjective requirement of knowledge demands that, however great the stretch toward religious

---

cross burning on private *or* public property. The Washington statute is analogous to our own in that it has a limited scope; the South Carolina and Maryland statutes differ fundamentally from ours by extending to public cross burnings.

[9]For example, a Western hostage in the Lebanese civil war recounted an incident when one of his captors "gasped in shock and horror" as the hostage reached toward the man's signet ring—which bore an Islamic symbol—for fear the sacred object would be touched by "unclean" hands. (Keenan, An Evil Cradling (1993) p. 108.)

symbolism, the offender is aware of it. To the offender who *knows* that an object is a religious symbol, the phrase cannot be vague. The requirement of purposeful or reckless terrorizing ensures against treatment of seemingly innocuous behavior as a desecration. An offender who has a purpose, or recklessly disregards a risk, of terrorizing—that is, of causing "a person of ordinary emotions and sensibilities to fear for personal safety" (§ 11411, subd. (d))—can have no doubt that the treatment of the religious symbol is desecrating and threatening.

Subdivision (c) of section 11411 does not target acts of religious desecration, but acts of terrorism. Desecration of a religious symbol—most commonly a cross burning—is merely the offender's vehicle for inflicting terror. The requirement of knowing, purposeful, and reckless mental states infuses the statute with an antiterrorism focus that notifies the citizenry what is prohibited, provides an explicit standard to law enforcement authorities, and avoids any potentially inhibiting effect on speech.

Steven also contends the phrase "reckless disregard" is unclear and requires a legislative definition.

The word "reckless" appears throughout the Penal Code in many different contexts. (§§ 190.2, subd. (d) [murder by aiding and abetting certain felonies "with reckless indifference to human life"], 452 [unlawfully causing a fire when a person "recklessly sets fire to or burns or causes to be burned, any structure, forest land or property"], 549 [solicitation of workers' compensation claim with "reckless disregard" for whether claimant intends to violate Ins. Code], 11172, subd. (a) [false report of child abuse made with "reckless disregard of the truth or falsity of the report"], 11413, subd. (a) [arson or explosion "in reckless disregard of terrorizing another"], 12303.2 ["recklessly" possessing destructive device in public or private place or on common carrier vehicle], 1000.6, subd. (d), 12028.5, subd. (a)(1), 13700, subd. (a) [definitions of domestic violence and abuse as including "recklessly" causing or attempting to cause or placing in apprehension of bodily injury].)

In one context—unlawfully causing a fire (§ 452)—the Legislature has provided a specific definition: " 'Recklessly' means a person is aware of and consciously disregards a substantial and unjustifiable risk that his or her act will set fire to, burn, or cause to burn a structure, forest land, or property. The risk shall be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. . . ." (§ 450, subd. (f).)

This definition derives from the Model Penal Code (*In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1066, fn. 10 [256 Cal.Rptr. 578]), which

defines recklessness as follows: "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." (Model Pen. Code, § 2.02, subd. (2)(c).)

By virtue of our Legislature's repeated inclusion of the word "reckless" in the penal statutes, and the adoption of the Model Penal Code definition in one of those statutes, the word has acquired a peculiar meaning in the law of California—the meaning adopted by the drafters of the Model Penal Code. The phrase "reckless disregard" is to be construed according to that meaning. (§ 7, subd. 16; *People* v. *Mirmirani, supra,* 30 Cal.3d at p. 384.) Thus, no further statutory definition is necessary.

## H. *Equal Protection*

Steven's final constitutional argument is that section 11411, subdivision (c), denies equal protection because it punishes those who desecrate religious symbols while ignoring those who desecrate nonreligious symbols. We conclude, however, that such differential treatment meets the standard of strict scrutiny, under which "a discriminatory law will not be given effect unless its classification bears a close relation to the promoting of a compelling state interest, the classification is necessary to achieve the government's goal, and the classification is narrowly drawn to achieve the goal by the least restrictive means possible. [Citations.]" (*Board of Supervisors* v. *Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913 [13 Cal.Rptr.2d 245, 838 P.2d 1198].) Given the role of the Ku Klux Klan in our nation's history, and the role of religious beliefs in world history, a malicious cross burning or desecration of some other religious symbol can be uniquely threatening, fearsome, and provocative. Desecration of a nonreligious symbol does not carry the same historical baggage. Special statutory treatment of unauthorized cross burnings and similar desecrations of religious symbols on another person's property furthers, and is necessary to, a compelling governmental interest in preventing acts of terrorism, which is absent in nonreligious desecrations. The statute is narrowly drawn, applying only to unauthorized conduct on the property of another. There is no unconstitutional denial of equal protection.

## I. *Conclusion*

We conclude that section 11411, subdivision (c), is not unconstitutional as to either its specific prohibition against cross burning or its general prohibition against desecration of religious symbols. The statute targets only acts of

terrorism on the private property of another person, not the expression of ideas. It is neither overbroad nor vague, is not an impermissible content-based prohibition on speech, and does not deny equal protection.

 The fact that the offense in this particular case was purportedly a practical joke does not make the incident harmless. The political philosopher Hannah Arendt, writing on the 1961 trial of Adolf Eichmann for crimes against humanity during World War II, coined the phrase "the banality of evil." (See Arendt, Eichmann in Jerusalem (Penguin ed. 1994) p. 252.) Her point was that evil can be done by people who are "terribly and terrifyingly normal." (*Id.*, at p. 276.) Racial and ethnic hatred is not perpetrated only by the world's great villains—sometimes it comes from the people next door. Cross burning was a problem in California when section 11411 was enacted in 1982 (see Governor's Task Force on Civil Rights, Rep. on Racial, Ethnic and Religious Violence in California (1982) pp. 1, 30, 37), and it remains a nationwide problem today (see Klanwatch Intelligence Rep. (Southern Poverty Law Center, pamp. Feb. 1994) pp. 23-25 [documenting 57 residential cross burnings nationwide in 1993]). The cross burning in which Steven participated might have been banal in its commission, but the harm to the Fosters was no less palpable than if the act had been committed by the Ku Klux Klan.

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . .

VI. DISPOSITION

The jurisdictional and dispositional orders are affirmed.

Merrill, Acting P. J., and Werdegar, J., concurred.

A petition for a rehearing was denied June 28, 1994, and appellant's petition for review by the Supreme Court was denied September 22, 1994. Werdegar, J., did not participate therein.

---

*Parts IV and V of this opinion are not certified for publication. (See fn., *ante*, at p. 598.)