[No. F028540. Fifth Dist. Jan. 18, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH DAVID BORRELLI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV, V, VI, VII, VIII and IX.

704

## COUNSEL

Fay Arfa, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Clayton S. Tanaka and Brian G. Smiley, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, P. J.**—By information filed in Stanislaus County Superior Court on February 19, 1997, appellant, Ralph David Borrelli, was charged with the burglary, arson, and vandalism of a dental office located at 3025 McHenry Avenue in Modesto, California in violation of Penal Code sections 459, 451, subdivision (c), and 594, subdivision (b)(2), respectively.[1] In addition, he was charged with the stalking of his estranged wife, Annette Borrelli, on or about July 21, 1995, and December 22, 1996, in violation of section 646.9, subdivision (a). Appellant entered not guilty pleas to the charges and requested a jury trial in the matter.

The burglary charge was subsequently set aside in response to appellant's section 995 motion.

The matter then proceeded to trial on the remaining counts. The jury found appellant guilty of arson of a structure as a lesser included offense of count II, vandalism and stalking.

On May 23, 1997, imposition of sentence was suspended and appellant was placed on three years' probation.

Notice of appeal was timely filed on June 9, 1997. Here, appellant raises various issues related to the constitutionality of the stalking statute, section 646.9; the sufficiency of the evidence to support his conviction of that offense; various instructions given in this case; and the trial court's refusal to allow the read back of defense counsel's closing argument. We affirm.

FACTS

*The Prosecution's Case-in-chief*

As pertinent to the issues presented on appeal, the facts show that appellant and Annette Borrelli were married in September of 1986 and separated in July of 1995 after she obtained a restraining order against him. During most, if not all of the time they were together, Ms. Borrelli worked as an

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

office administrator for Modesto Dental Group located at 3025 McHenry Avenue.

On September 21, 1995, Ms. Borrelli went to Merced to visit her parents. She was getting ready to leave to meet appellant at her Turlock home when he arrived, uninvited, to pick up their children. Ms. Borrelli was surprised to see appellant because the plan had been for him to pick up the children at her home.

While Ms. Borrelli was putting the children in appellant's car, he was threatening her and telling her that he was going to kill both her and her parents. Before she could finish strapping the children in, appellant began backing up his truck as though he was going to run over her feet. He then left with the children.

Ms. Borrelli left her parents' home about 45 minutes later without telling her parents about the threats. She was too afraid to tell them because her father was in very poor health.

A few hours later, appellant arrived unannounced at Ms. Borrelli's Turlock home. Appellant was very angry because the children had fallen asleep and he had nowhere to take them. He stomped on her foot, kicked her, and screamed obscenities at her. He then took off with the children still in the car.

Ms. Borrelli decided to talk to her brother-in-law about the situation because appellant frightened her. Later that day, she called the police.

On December 2, 1995, appellant came to pick up the children. Ms. Borrelli was not home at the time, as she had left the children with a baby-sitter. A short time later, appellant showed up at the salon where Ms. Borrelli was getting her hair done. He was very angry and called her names. He then left.

Appellant contacted her a few hours later and complained that the clothes she had packed for the children were inappropriate. He wanted new clothes. So, Ms. Borrelli hurried home and packed some clothes. She had just sat down in her car to retrieve something when she felt it move and realized that appellant had rear-ended her. He hit her car hard enough to cause Ms. Borrelli's neck to go back "and [cause] a good feeling in it."

Ms. Borrelli had been talking to her girlfriend on her cell phone at the time. She told her girlfriend what had happened and expressed her fear of

appellant. Her girlfriend called the police while Ms. Borrelli locked her car doors.

Appellant came up and began banging on the door. He was very angry and hostile when he told her he was going to kill her. He left with the children before the police arrived.

Appellant came back later that evening to return the children. As Ms. Borrelli went to get the baby, appellant, very angry, "kind of went towards [her] to grab [her] on the neck." She ran into the house with the baby, locked the door, and called the police. She told appellant to leave their little girl at the front door with her things and to leave because the police were on their way. As soon as she saw him get in his vehicle, she opened the door and pulled her little girl inside.

Appellant was gone by the time the officers first arrived but returned in time to tell them his side of the story. The incident ended with appellant being taken to jail.

Then, on April 15, 1996, appellant telephoned the house and their daughter answered. Ms. Borrelli was standing right next to her when appellant said something that upset their daughter. Ms. Borrelli got on the phone and appellant told her he was going to kill her. She hung up the phone but did not report the incident to the police at that time.

She telephoned the police the very next day after receiving another phone call from appellant. It was shortly before 6:00 a.m. when appellant called and told her today was the day he was going to kill her.

One of the times he threatened to kill her, he said he would blow her head off with a gun. She was very frightened and became a nervous wreck each time she was threatened. She knew appellant owned a couple of firearms and she had seen ammunition around the house during the time they were together. He told her that he kept one of his guns in his car.

To her knowledge, the only other person appellant had ever threatened to kill was himself. Ms. Borrelli had contacted the police more than once when this occurred since appellant seemed likely to carry out the threat.

On May 1, 1996, she moved to another location and did not give appellant her new address. From that point on, she and appellant exchanged the children at the Turlock Police Department.

On May 7, 1996, appellant showed up at Ms. Borrelli's place of employment. He barged into her office, called her several names, and blamed her

for his inability to have surgery on his arm. She did not know why he was blaming her. As far as she knew, appellant was working with some type of program that was going to pay the costs of the surgery.

During cross-examination, defense counsel suggested that appellant may have blamed her because she was withholding money he needed for his operation. Ms. Borrelli said there had been no discussion about money at the time of that incident. She said the discussions about money took place in July as part of their dissolution proceeding.

Defense counsel then asked whether appellant had asked her to free up some funds so he could have them. She insisted appellant never made that request in May.

In response to further defense questioning, Ms. Borrelli said the family home was subsequently sold and that there was no second home during the time she and appellant were together. Defense counsel tried to ask about another home that was put in her parents' names but the trial court advised counsel that it was going to sustain all future objections directed at questions regarding the dissolution proceedings.

When asked at trial whether she wanted to see her husband convicted, Ms. Borrelli replied that she wanted him to quit bothering her and to get the help he needed. She wanted him held accountable for the things he had done to her. She denied ever threatening to harm or kill appellant.

Mr. Patterson also testified for the prosecution. He said he was in Modesto visiting relatives on December 22, 1996. Sometime after 10:00 p.m., he found himself trying to jump-start a car in the Mervyn's parking lot on McHenry Avenue with his fiancée, her sister Tina, and Tina's husband, Frank Solorio.

A short time later, Mr. Patterson and Frank Solorio noticed a fire across the street. Neither man heard a crash but Mr. Patterson thought that might have been because they had gotten their car started.

The two men ran over there to investigate and found a burning car smashed into a building. They contacted appellant, who was the only person nearby, and asked if he knew what happened. Appellant said he did as it was his car. They asked appellant if he had lost control of the car. Appellant said no, he was making a statement to his girlfriend who worked in the building. Appellant left before the firefighters arrived on the scene.

*The Defense Case*

Appellant testified that he and Annette separated on July 7, 1995, and that a dissolution action was pending. He said they were engaged in a property

dispute over two houses, a lot of money and a payroll company that they had started in 1989. Appellant accused Annette of keeping over $30,000 from him and commented that $64,000 in cash had disappeared.

Appellant said Annette had not accurately portrayed the events that took place on May 7, 1996. He explained that he had broken his arm in five places and had been to the hospital that morning for a "pre-op" examination. He was scheduled for surgery to repair his wrist.

He went to Annette's office and asked her if they could please get their dissolution finalized so he could get the stocks and bonds out of his name. He explained that he could not get the surgery done so long as the stocks and bonds remained in his name. He said Annette's response was "I'll see you in court. Go talk to your lawyer." Appellant denied threatening her.

On cross-examination, appellant admitted to "probably" having used foul language and speaking in a sufficiently loud voice so that everyone present could hear. He said he was very upset when he learned that he was not going to be able to have the surgery.

Appellant was then asked about the September 16, 1995, incident. He did not recall what happened on that date. It was not until defense counsel specifically asked whether appellant heard Annette accuse him of stomping on her foot and kicking her that appellant denied that those things had occurred.

Appellant had no recollection of the events of April 15, 1996, either. When defense counsel asked appellant if he threatened to kill Annette on that date, appellant replied, "I don't believe so."

He denied threatening to kill her the very next day. Later, he said he had no recollection of the events of April 16th—even after having read the police report of the incident.

Appellant admitted having feelings of animosity against Annette but denied having ever threatened to kill her—particularly with a gun. By the time of these events, he had gotten rid of his deer rifle and handguns. His handguns were with his brothers, who had agreed to keep them for him.

Appellant also testified that Annette was not afraid of him. On cross-examination, however, he admitted that she had moved and that he did not know her new address. He volunteered that he could have easily learned of it if he was really stalking her by simply following her after they exchanged the children.

He also denied having ever threatened to kill himself. He did, however, clearly recollect a phone conversation he had with one of Annette's coworkers. He said Annette would not come to the phone so he told the coworker to "tell Annette if she won't come to the phone, what does she want me to do, go out and kill myself?" When counsel asked if he was serious, appellant replied, "I'm still alive."

Appellant did say that Annette had threatened to kill him five to 10 times. She had also threatened to have him thrown in prison for the rest of his life although he did not take these threats seriously. He did call the police on her once after she had beaten him with a broom.

Appellant also spoke of the events of December 22, 1996. He said he had been drinking and went to Mervyn's to do some Christmas shopping. He got upset when he discovered he did not have enough money to pay for his children's presents. He decided that, since he could not get the money his wife owed him, he might as well give her the car too; particularly since it was having a lot of mechanical problems.

So, he drove it through the front doors of his wife's workplace. He then got out of the car (which he left running) and sat on a curb 25 yards away to wait for the police.

While seated, he looked up and saw the car begin to burn. He initially said he first saw flames in the right front section of the car before they spread to both the inside and outside of the car. Later, he said the fire started in the passenger compartment. Still later, he admitted that the photographs of the car did not show any fire damage to the front of the car.

Appellant denied setting the car on fire. He said he did not want it to burn since it was in good shape other than the engine, which needed replacement, and the leaky transmission. In that appellant is not challenging his arson conviction on appeal, we will not further address the testimony regarding that charge.

DISCUSSION

I

*Section 646.9 as Violative of the Right to Free Speech*

Appellant contends section 646.9 is unconstitutional because it infringes on the free speech rights guaranteed under the First Amendment to

the United States Constitution and article I, section 2 of the California Constitution. More specifically, he argues that section 646.9 unconstitutionally affects freedom of speech because it only requires that the threat generate reasonable fear. There is no statutory requirement that the person doing the harassing actually intend to carry out his or her threat. Appellant maintains that the statute prevents people from "expressing their feelings and ideas, under circumstances where no one will get hurt. The statute leaves it immaterial whether the accused of [*sic*] another person has the perceived capacity to carry out the threat; a successful bluff will suffice." He also maintains that the statute does not require "that the accused make a serious expression of intention to inflict bodily harm under circumstances such that there is a reasonable tendency to produce in the victim a fear that the threat will be carried out." Appellant thus reasons that, as currently written, section 646.9 is unconstitutional.

Respondent believes the statute does not infringe on appellant's right of free speech since it permissibly restricts unprotected speech that takes the form of serious threats made under such circumstances that there is a reasonable tendency to produce in the victim a fear that the threat will be carried out. Respondent cites *Watts v. United States* (1969) 394 U.S. 705, 706-708 [89 S.Ct. 1399, 1400-1402, 22 L.Ed.2d 664]; *People v. Hines* (1997) 15 Cal.4th 997, 1061 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365]; and *People v. Fisher* (1993) 12 Cal.App.4th 1556 [15 Cal.Rptr.2d 889], as support for this position.

We begin our analysis by examining the constitutional guarantees in question. The First Amendment to the United States Constitution states: "Congress shall make no law . . . abridging the freedom of speech . . . ." This fundamental right is applicable to the states through the due process clause of the Fourteenth Amendment. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 133-134 [87 Cal.Rptr.2d 132, 980 P.2d 846], citing *Gitlow v. People of New York* (1925) 268 U.S. 652, 666 [45 S.Ct. 625, 629-630, 69 L.Ed. 1138].) Article I, section 2, subdivision (a) of the California Constitution provides that: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

■ While these guarantees are stated in broad terms, "the right to free speech is not absolute." (*Aguilar v. Avis Rent A Car System, Inc., supra*, 21 Cal.4th at p. 134, citing *Near v. Minnesota* (1931) 283 U.S. 697, 708 [51 S.Ct. 625, 628, 75 L.Ed. 1357]; and *Stromberg v. California* (1931) 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484].) As our high court has

acknowledged: "Many crimes can consist solely of spoken words, such as soliciting a bribe (Pen. Code, § 653f), perjury (Pen. Code, § 118), or making a terrorist threat (Pen. Code, § 422). As we stated in *In re M.S.* (1995) 10 Cal.4th 698, 710 . . . : '[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, " 'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . .' " [Citations.]' [Citations.] . . . A statute that is otherwise valid, and is not aimed at protected expression, does not conflict with the First Amendment simply because the statute can be violated by the use of spoken words or other expressive activity. (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 628 [104 S.Ct. 3244, 3255, 82 L.Ed.2d 462] . . . .)" (*Aguilar v. Avis Rent A Car System, Inc.*, *supra*, 21 Cal.4th at p. 134.)

Section 646.9, as it read in 1996, provided that:

"(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking . . . . [¶] . . . [¶]

"(e) For the purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person.

"(f) For purposes of this section, 'course of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

"(g) For the purposes of this section, 'credible threat' means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety

or the safety of his or her family and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. . . ."

As appellant acknowledges, "the state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of the First Amendment protection." (*In re M.S.*, *supra*, 10 Cal.4th at p. 710, citing *People v. Mirmirani* (1981) 30 Cal.3d 375, 388, fn. 10 [178 Cal.Rptr. 792, 636 P.2d 1130]; see *Watts v. United States*, *supra*, 394 U.S. at pp. 706-708 [89 S.Ct. at pp. 1400-1402].) The *M.S.* court explained the reasoning behind this premise as follows:

"In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs . . . ." ' (*Shackelford* v. *Shirley* (5th Cir. 1991) 948 F.2d 935, 938, quoting Tribe, American Constitutional Law (2d ed. 1988) § 12-8, pp. 836-837.) As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. (*Shackelford* v. *Shirley*, *supra*, 948 F.2d at p. 938.) Nonetheless, statutes criminalizing threats must be narrowly directed against only those threats that truly pose a danger to society. (*People* v. *Mirmirani*, *supra*, 30 Cal.3d at p. 388, fn. 10.)

█ "A threat is an ' "expression of an intent to inflict evil, injury, or damage on another." ' (*U.S.* v. *Orozco-Santillan* (9th Cir. 1990) 903 F.2d 1262, 1265.) When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection. (*Id.* at pp. 1265-1266; *In re Steven S.* (1994) 25 Cal.App.4th 598, 607 [31 Cal.Rptr.2d 644]; *Wurtz* v. *Risley* [(9th Cir. 1983)] 719 F.2d [1438,] 1441 ['It is true that threats have traditionally been punishable without violation of the [F]irst [A]mendment, but implicit in the nature of such punishable threats is a reasonable tendency to produce in the victim a fear that the threat will be carried out.']; see also *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886, 927 [73 L.Ed.2d 1215, 1245, 102 S.Ct. 3409] [involving public speeches advocating violence].)

"In contrast, 'political hyperbole' of the sort at issue in *Watts v. United States*, *supra*, 394 U.S. 705 (*Watts*) remains within the 'marketplace of ideas'

protected by the First Amendment. (See *U.S.* v. *Gilbert* (9th Cir. 1987) 813 F.2d 1523, 1531.) In *Watts*, a young man attending a political rally in Washington, D.C., during the time of the Vietnam War, informed a group of attendees that he had just received his draft notice to report for induction and declared he would not go. 'If ₁they ever make me carry a rifle,' he stated further, 'the first man I want to get in my sights is L.B.J.' His listeners laughed. (*Watts*, *supra*, 394 U.S. at pp. 706-707 . . . .) In reversing Watts's conviction for threatening the life of the President, the United States Supreme Court considered the context and expressly conditional nature of the statement, as well as the listeners' reaction. The high court concluded the statement, rather than a threat, was merely a ' "very crude offensive method of stating . . . political opposition." ' (*Id.* at pp. 707-708 . . .)" (*In re M.S.*, *supra*, 10 Cal.4th at pp. 710-711.)

■ Appellant's arguments reflect his misunderstanding of the stalking offense and the rights at stake. In order to be penalized under section 646.9, subdivision (a), the defendant must willfully engage in the prohibited conduct with the intention of inflicting substantial emotional distress on the person to whom the comments were directed in violation of the latter's constitutionally guaranteed rights to pursue safety, happiness, and privacy as guaranteed by our state and federal Constitutions; the threats must be made with the apparent ability to carry them out so as to cause the person who is the target of the threat to reasonably fear for his or her safety; and the victim must actually suffer substantial emotional distress. Thus, contrary to appellant's characterization of the statute, someone who is merely "blowing off steam," without more, could not be found to have violated the statute. Also contrary to his arguments, comments regulated by section 646.9 are not made in a manner in which no one will be hurt. As noted, the victim must actually suffer substantial emotional distress. This type of threat truly poses a danger to society and is therefore a proper subject for regulation. (See *In re M.S.*, *supra*, 10 Cal.4th at p. 70; *People v. Mirmirani*, *supra*, 30 Cal.3d at p. 388, fn. 10.)

In any event, appellant's arguments miss the mark. Section 646.9 does not regulate the *content* of speech insomuch as *the manner* in which the communication is made. While the right to free speech guarantees a powerful right to express oneself, it does not include the right to repeatedly invade another person's constitutional rights of privacy and the pursuit of happiness through the use of acts. and threats that evidence a pattern of harassment designed to inflict substantial emotional distress. The aim and effect of this statute are not to suppress speech, but to protect individuals in the exercise and enjoyment of their constitutional rights from invasive, oppressive conduct

that infringes on those rights. (See *In re M.S., supra,* 10 Cal.4th at p. 722 [same but applied to § 422.6]; *In re Steven S.* (1994) 25 Cal.App.4th 598, 606-609 [31 Cal.Rptr.2d 644] [same but applied to § 11411].)

Appellant correctly notes the absence of a statutory requirement that the person doing the harassing actually intend to carry out the threat. But he has failed to cite any legal authority that mandates inclusion of such a require-ment before a statute governing conduct directly and speech coincidentally can be upheld against constitutional attack. Indeed, the courts have upheld various statutes regulating expressive conduct against constitutional attack despite the absence of such a requirement. (See, e.g., *People v. Hines, supra,* 15 Cal.4th at pp. 1060-1061 [constitutionality of § 69, which prohibits "attempts, by means of any threat or violence, to deter or prevent an executive officer from performing [his/her lawful duties]" so that said conduct can be considered as a factor in aggravation in a death penalty case]; *People v. Falck* (1997) 52 Cal.App.4th 287, 295 [60 Cal.Rptr.2d 624] [§ 646.9 and cases cited therein]; *In re Steven S., supra,* 25 Cal.App.4th at pp. 606, 608 [prohibition of racial, ethnic and religious terrorism under § 11411, subd. (c)].)

In sum, section 646.9 does not infringe on the free speech rights guaran-teed by the Constitution.

## II

### *Vagueness and Overbreadth Challenges to Section 646.9*

▮ Appellant next argues that the statute violates his due process rights because it forbids the doing of an act in such vague and overbroad terms that persons of ordinary intellect must speculate as to the meaning of "safety." To make his point, he asks, does the act refer to emotional or financial safety? He asserts that any type of threat would be punishable under the statute as written because safety has yet to be defined. He believes the judicial gloss placed on the statute by the court in *People v. Falck, supra,* 52 Cal.App.4th 287 limiting the statute's application to threats that pose a danger to society is equally vague and unconstitutional.

Respondent agrees with the *Falck* court's conclusion that "safety," within the meaning of section 646.9, is readily understandable and thus not subject to an attack for vagueness. Respondent also points out that the word is one

of common usage and meaning and one which was declared to be readily understandable in a slightly different legal setting in *In re Joseph G.* (1970) 7 Cal.App.3d 695, 703-704 [87 Cal.Rptr. 25].

Respondent insists appellant cannot succeed on his overbreadth claim because he cannot show the statute inhibits a substantial amount of protected speech—a showing which *In re M.S., supra,* 10 Cal.4th at page 710 requires him to make in order to prevail on this type of claim. Nor does respondent believe that the "safety" referenced in the statute must be limited to *physical* safety as urged by appellant. He opines that threats directed at killing one's dog or burning down their house would fall within the scope of section 646.9 even though they are directed at a person's chattels rather than one's physical well being. Respondent believes reading the statute in this manner would further the strong public policy that every person has the right to be protected from fear and intimidation.

■ Overbreadth is a doctrine that addresses a statute's reach, not its clarity, the latter being the subject of the vagueness doctrine. Recently, our Supreme Court had the following to say when speaking on the subject of overbreadth:

"Although constitutional rights are generally said to be personal, a well-established exception is found in the overbreadth doctrine associated with First Amendment jurisprudence. (*Wurtz* v. *Risley* (9th Cir. 1983) 719 F.2d 1438, 1440.) Under this doctrine, litigants may challenge a statute not because their own rights of free expression are violated, but because the very existence of an overbroad statute may cause others not before the court to refrain from constitutionally protected expression. (*Broadrick* v. *Oklahoma* (1973) 413 U.S. 601, 612 [37 L.Ed.2d 830, 839-840, 93 S.Ct. 2908]; *Wurtz* v. *Risley, supra,* 719 F.2d at p. 1440.)

"To succeed in a constitutional challenge based on asserted overbreadth, [a claimant] must demonstrate the statute inhibits a substantial amount of protected speech. (*New York* v. *Ferber* (1982) 458 U.S. 747, 768-769 [73 L.Ed.2d 1113, 1129-1130, 102 S.Ct. 3348].) '[O]verbreadth . . . must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' (*Broadrick* v. *Oklahoma, supra,* 413 U.S. at p. 615 . . . .) We are bound, if possible, to construe a statute in a fashion that renders it constitutional. (See *People* v. *Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694] [' "it is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citations.]" '].)" (*In re M.S., supra,* 10 Cal.4th at pp. 709-710.)

We do not find the statute to be unconstitutionally overbroad. The statute does not encompass every kind of threat, as asserted by appellant. The threats in question must be made by one who "willfully, maliciously, and repeatedly follows or harasses" another and with the intent to place the victim in reasonable fear of his or her safety. (§ 646.9, subd. (a).) The threat must also be accompanied by a "knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) This course of conduct must be such as would "cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person." (*Ibid.*) Finally, the "credible threat" must be comprised of "a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant ha[ve] the intent to actually carry out the threat. . . ." (§ 646.9, former subd. (g).) Threats of this nature clearly present a danger to society. Section 646.9 clearly limits its application to this type threat that finds no protection under the First Amendment. As such, it does not implicate a substantial amount of constitutionally protected conduct, and appellant's claim of overbreadth must fail.

Appellant asks us to limit the term "safety" to mean only physical safety. In advancing his claim, appellant directs our attention to only those offenses that the Legislature has specifically defined to include threats of violence, death or great bodily injury. (§§ 76 [threatening certain public officials], 137 [influencing testimony or information given to a law enforcement official], 139 [dissuading a witness or victim] 601 [trespass].)[2] Since the statute in question does not contain such language, these cases provide no authority for the position advanced by appellant. What is far more telling is the fact that the Legislature did not see fit to include language of violence in the version of section 646.9 in place when appellant committed these offenses. Indeed, with the 1994 amendment to the statute, the Legislature intentionally deleted the "reasonable fear of death or great bodily injury" language and replaced it with the "threat in reasonable fear for his or her safety" language that has

---

[2]Appellant also cited section 832.9 and Code of Civil Procedure section 527.8. Neither of these statutes defines criminal offenses. The first merely provides for the award of relocation costs to a peace officer or his or her immediate family member whose live(s) have been threatened. The second statute sets out the procedures to be utilized by a victim of harassment in the workplace in order to obtain a restraining order or injunctive relief to prevent said harassment.

remained a part of section 646.9 ever since. (See Stats. 1993, ch. 581, § 1, p. 2876 (Assem. Bill No. 1178).) Consequently, this claim must fail as well.

■ We turn our attention then to appellant's vagueness claim. The court in *People v. Falck, supra,* 52 Cal.App.4th 287, faced essentially the same vagueness challenge to the constitutionality of section 646.9 as those presented for our consideration. (52 Cal.App.4th at p. 290.) ■ We find the *Falck* court's reasoning most persuasive and, accordingly, quote it at length:

"California's high court recently summarized the relevant legal principles: 'The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, each guarantee that no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires "a reasonable degree of certainty in legislation, especially in the criminal law . . . ." [Citation.] "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." [Citations.]

" 'It is established that in order for a criminal statute to satisfy the dictates of due process, two requirements must be met. First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed. [Citations.] Because we assume that individuals are free to choose between lawful and unlawful conduct, "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws trap the innocent by not providing fair warning." [Citations.]

" 'Second, the statute must provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. [Citations.] When the Legislature fails to provide such guidelines, the mere existence of a criminal statute may permit " 'a standardless sweep' " that allows police officers, prosecutors and juries " 'to pursue their personal predilections.' " [Citations.]' [Citation.]

■ "Section 646.9 has withstood constitutional challenge for its inclusion of the term 'repeatedly.' [Citation.] It also has been found that the terms 'harasses' and 'credible threat' are sufficiently defined by the statute, and that the terms 'willfully' and 'maliciously' are sufficiently definite. [Citation.] Appellant here challenges the term 'safety,' present in the phrase 'Any

person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her *safety*, or the *safety* of his or her immediate family, is guilty of the crime of stalking.' (§ 646.9, subd. (a), italics added.) Appellant points out that the term is not defined by the statute and argues that it has no clear definition, citing The Random House Dictionary of the English Language (1969), page 1259, which defines the term as the state of being safe; freedom from the occurrence of risk of injury, danger, or loss. In appellant's opinion, such a definition is no real definition at all.

■ "It is not, however, necessary that a term be defined by statute, or even that it have a precise dictionary definition. '[R]equisite standards of certainty can [often] be fleshed out from otherwise vague statutory language by reference to any of the following sources: (1) long established or commonly accepted usage; (2) usage at common law; (3) judicial interpretations of the statutory language or of similar language; (4) legislative history or purpose. [Citation.]' [Citation.] The [Fifth District Court of Appeal] in *In re Joseph G.* (1970) 7 Cal.App.3d 695 [87 Cal.Rptr. 25] considered the term 'safety' as set forth in section 647, a statute that defines disorderly conduct as including a state of intoxication in a public place in such condition that the offender is unable to exercise care for his own *safety* or the *safety* of others. ■ The opinion in that case both recognized that the term has a commonly accepted usage and provided judicial interpretation of the term: 'The word "safety," as used in Penal Code section 647, subdivision (f), whether related to a defendant himself or to others, . . . has a commonly understood meaning which gives adequate notice of the conduct proscribed. To begin with, there is a clear and understandable dictionary definition of "safety": "1. Condition of being safe; freedom from danger or hazard. 2. Quality of being devoid of whatever exposes one to danger or harm; safeness." [Citation.] [¶] We find also that the word is used in article I, sections 1 and 4, and article XX, section 21, of the California Constitution. It is used in the Code of Civil Procedure, Labor Code, Public Utilities Code, Harbor[s] and Navigation[s] Code, Business and Professions Code, Public Resources Code, Government Code, Vehicle Code, Elections Code, Education Code, and others. [¶] The point is, the word "safety" is widely and commonly used, as evidenced by the foregoing catalogue of code and Constitution uses, and it cannot be said that by reason of its use in subdivision (f) of Penal Code section 647 the statute is unconstitutionally vague and uncertain.' [Citation.]" (*People v. Falck, supra*, 52 Cal.App.4th at pp. 293-295, fn. omitted.) We too rely on this reasoning to find no constitutional vagueness in the use of the term "safety" in section 646.9, subdivision (a).

III-IX*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Thaxter, J., and Harris, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 19, 2000.

---

*See footnote, *ante*, page 703.