Filed 5/19/23  P. v. Markley CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>MARY JOANNE MARKLEY,<br><br>　　　Defendant and Appellant. | D080458<br><br><br><br>(Super. Ct. No. SCD209934) |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Reversed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, James M. Toohey and Randall D. Einhorn, Deputy Attorneys General for Plaintiff and Respondent.

Seventy-year-old Mary Joanne Markley has remained committed to the state hospital system since 2009 when she was found not guilty by reason of insanity (NGI) on charges of felony stalking, disobeying a court order, and contempt of court. In the intervening 14 years, the People obtained numerous two-year extensions pursuant to Penal Code section 1026.5, subdivision (b), including an order extending her commitment to August 10, 2022. That order is the subject of this appeal.[1] Markley contends there is insufficient evidence to support the court's finding that due to her mental disorder she represents a substantial danger of physical harm to others. She further argues that, should we reverse for this reason, double jeopardy bars any subsequent extensions of her commitment. We agree with both points and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Underlying Offenses*[2]

Markley first met Richard H. in 1998 when she visited his antiques store as a customer. In June 1999, they had lunch together. To Richard's surprise, Markley explained that she wanted to marry him, have one child, and live in his house. He responded that he was flattered but did not know her well enough to get married. During their second date two months later, Markley maintained she and Richard had met previously and that she had been introduced to his parents, none of which was true. At this point,

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

[2]    The factual background regarding the offenses underlying Markley's commitment is taken from the State Department of State Hospitals at Patton's report (Patton State Hospital or Patton).

Richard believed there was something wrong with Markley and told her he no longer wanted to see her.

Markley, however, continued stopping by Richard's antiques store. During one of these visits, Markley told Richard to stop calling her. When he responded that he was not calling her, Markley said, "You're sending me messages." Over time, Markley became more demanding and agitated. On one occasion, she purportedly told a store employee, "I could just kill [Richard]."

By November 1999, a three-year restraining order was entered against Markley, but in less than a year she violated it several times. She was arrested the same month the restraining order was issued for calling Richard's cellphone. Five months later, she was again arrested after visiting Richard's home and telling him she loved him. Two months after her release from jail, she visited Richard's store twice and confronted employees about Richard's supposed relationship with her.

From September to December 2001, Markley continued calling Richard and visiting his home. Ultimately, she was arrested again and later imprisoned. But the day after her release in March 2004, Markley walked into the master bedroom of Richard's home, which had been left unlocked for construction work. Convicted of stalking, Markley was sentenced to another four years in prison. She was released in August 2006. Five days later Markley visited Richard's store, leading to her arrest and an additional year in custody.

B.    *The Initial Commitment and Prior Extensions*

In August 2007, a few days after her latest release from custody, Markley was again arrested for visiting Richard's San Diego home and speaking with his daughter. Charged with felony stalking (§ 646.9, subd. (a)),

disobeying a court order (§ 273.6, subd. (a)), and contempt of court (§ 166, subd. (a)), the court found her not guilty by reason of insanity. She was committed to Patton State Hospital pursuant to section 1026. The district attorney later utilized the procedures in section 1026.5, subdivision (b),[3] to obtain three two-year extensions of Markley's commitment to August 10, 2020.

C. *The Current Extended Commitment Trial*

In February 2020, the district attorney petitioned the superior court for another two-year extension of Markley's civil commitment to August 10, 2022 (the Petition). Because Markley asked to represent herself, the court appointed two psychologists to evaluate whether she was competent to do so. Both psychologists concluded she was, and the court granted her request.

The court then conducted a bench trial on the Petition. The People called three expert witnesses (Drs. Wendy Ng, Mario Souza, and Jenna Tomei), while Markley called four (Drs. Azhar Abdullah, Daniel Rubin, Alma Carpio, and Valerie Rice).

1. *The People's Experts*
   a. *Dr. Wendy Ng*

The People's primary witness was Dr. Wendy Ng, a senior psychologist and forensic specialist at Patton. She interviewed Markley on at least one occasion and provided much of the background information on her condition. Ng agreed with Markley's diagnoses—a delusional disorder (erotomanic and somatic type) and narcissistic personality disorder. Her delusional disorder

---

[3] Section 1026.5, subdivision (b) provides that a person who has pleaded NGI may be committed beyond the maximum term of commitment if the person, by reason of a mental disease, defect, or disorder, presently represents a substantial danger of physical harm to others.

4

is characterized as "erotomanic" because of her fixed, incorrect belief that Richard is in love with her.[4] Markley's narcissistic personality disorder diagnosis reflects an exaggerated feeling of self-importance, a sense of self-entitlement, and a lack of empathy for Richard.

Markley is prescribed three milligrams of Risperdal for her psychotic symptoms and is medication compliant. Dr. Ng noted that Markley required "a great deal of persuasion" from her treatment team before agreeing to increase her dosage from one milligram to three milligrams. Ng did not know how long Markley had been taking the three milligram dosage.

Dr. Ng described Markley's treatment history. She began her treatment at Patton in August 2009. In September 2015, she was transferred to a locked step-down facility, Sylmar Health & Rehabilitation Center (Sylmar), with the goal of eventually transitioning her to outpatient treatment. However, around February 2018, she interpreted her conversation with a Sylmar cafeteria worker as evidence that Richard was attempting to contact her. Although her delusional beliefs continued for a few months, she hid them from her Sylmar treatment team and began calling Richard. Markley was sent back to Patton after Richard notified the district attorney. When Ng asked about the situation during her interview, Markley explained that she had felt a physical pressure to call Richard, and she could not control those feelings even though she wanted to.

The only arguably threatening statement Markley ever made occurred decades ago when she told a third party that she "could just kill [Richard]." She had never been physically aggressive with Richard or with anyone else.

---

[4]    Her delusional disorder is "somatic" because of her fixed, incorrect belief that she is infected with a rare South American parasite—a belief that she has maintained despite several medical evaluations showing no evidence of an infection.

Once years ago, she became frustrated and was described as "agitated" when she showed up to Richard's store and was unable to find him. During this time, Markley continued to contact store employees and Richard's family members, despite repeatedly being told that Richard was not interested in her and that he had a restraining order against her. Patton staff described Markley as becoming easily agitated when her needs were not immediately met, but this agitation had never escalated to physical violence.

To evaluate Markley's risk of violence, Dr. Ng used the Historical Clinical and Risk Management 20 (HCR-20) framework, a structured clinical judgment tool. (See generally Douglas et al., *Historical-Clinical-Risk Management-20* (*HCR-20v3*): *Development and Overview* (2014) 13 Intern. Assn. Forensic Mental Health Svcs. 93.) The HCR-20 is used to predict the risk of violence incorporating "20 factors that are considered one of the gold standard[s] in . . . risk assessments." Ng explained that in using the HCR-20, "We check off factors that are relevant to [the individual] that are either absent, potentially present, or present . . . [¶] [a]nd after that, we evaluate whether or not a certain risk factor is highly relevant to someone's risk, moderately relevant, or at low risk." The historical factors are not changeable and include history of violence, antisocial behaviors, substance use, major mental illness, personality disorder, and trauma. When asked if she actually performed an HCR-20 evaluation in Markley's case or "use[d] more the structure of it," Ng responded that the team "used the structure of it to guide our evaluation and risk assessment."

Using the HRC-20 to "guide" her evaluation, Dr. Ng concluded that Markley posed "a substantial danger of physical harm to others" and that based on Markley's recent revocation from Sylmar, she had previously and continues to have "serious difficulties controlling her behavior." Ng found

6

Markley's poor insight into mental illness and poor response to supervision and interventions to be relevant historical factors under the HCR-20.

As to the lack of insight factor, Dr. Ng testified that Markley does not fully understand the seriousness of her offending behavior or the risk of her symptoms reemerging. Markley, in Ng's view, had a general tendency to minimize the seriousness of her offenses and was unable to fully grasp the importance of ongoing treatment. According to Ng, it was significant Markley still believed that because Richard waited three months to report the Sylmar incident, rather than disclosing it immediately, her actions were "not as serious." Ng opined that Markley's narcissistic personality disorder and sense of entitlement are a barrier to treatment because Markley perceives herself as higher functioning and more knowledgeable than other patients and believes that she should be teaching others rather than being treated herself.

As part of her evaluation, Dr. Ng also reviewed Markley's prior "stalking risk assessment" from approximately 2012. This assessment by another doctor found that Markley's risk for relapse of stalking behavior upon release was high, but that the risk her stalking behavior would escalate into physical violence was low. Ng agreed with both conclusions "because Ms. Markley has not physically acted out violently against her victim . . . ." The People asked Ng if there were some factors that, if they surfaced, would increase Markley's risk of physical violence, and Ng responded, "Yes. Absolutely." She added that "without adequate supervision and support, there is a risk that [Markley's] false beliefs and symptoms will reemerge . . . and there is the potential for it to escalate into something more serious."

7

The People asked Dr. Ng to justify her overall opinion that Markley posed a substantial danger of physical harm to others despite Ng's agreement with the stalking risk assessment's conclusion that Markley had a *low* risk of her stalking behavior escalating to physical violence. Ng responded that "there is a high risk" Markley's stalking behavior can escalate into physical harm when considering her past history of making verbal threats against Richard; repeatedly showing up at Richard's home; harassing Richard; and her "still lacking" insight into her mental illness. Ng was also concerned that Markley did not understand the seriousness of being released into the same community—San Diego—where Richard may reside.

The court asked whether Markley had a low, medium, or high risk of causing physical harm to another should she be released. Dr. Ng responded, "That can be very difficult to determine because of the time frame at which we complete the assessment, it is very difficult to provide that rate. [¶] If it is in the short term, her risk of physical harm to another can be low. It can be medium. [¶] However, if her mental status, if there is a change without the adequate support supervision, medication management, it can change from low all the way up to high."

b. *Dr. Mario Souza*

The People next called Dr. Mario Souza, a senior psychologist at Patton in the forensic evaluation department who interviewed Markley once. Souza testified that Markley was not yet suitable for outpatient community supervision and that, even if released to supervised outpatient treatment, she would "pose[ ] a risk of physical harm to others." He explained that, despite Markley's lack of prior violence, stalking is a "unique type of violence," and "stalking behavior is not violence until it is." The consistency and intensity of Markley's delusional obsession with Richard, despite years of hospitalization

8

and incarceration, raised concerns for Souza about how Markley would respond to "active rejection" from Richard. Souza further explained that for the HCR-20, "violence" is defined as "the victim having intense fear for their physical well-being or intense psychological fear," and stalking behavior contributes to violence in the community "quite often . . . if there is no intervention prior to that one moment of violence."

Upon further questioning by the court, Dr. Souza explained that the HCR-20 did not produce a recidivism prediction but instead used "empirically-supported risk factors" to determine someone's violence risk. Souza did not use any other tools besides the HCR-20 in evaluating Markley's risk of violence.

Dr. Souza did not know the size of the initial sample group used to develop the HCR-20 or what percentage of the sample group consisted of persons found not guilty of stalking by reason of insanity. When asked what percentage of persistent stalkers like Markley escalate to physically harming a victim, Souza responded that it "really depends on many aspects of the crime and the individuals" and that stalking behavior is more commonly seen in males, which is more widely studied. According to Souza, the duration and intensity of stalking behavior and the insight of the stalker into her behavior affect the likelihood that stalking behavior will become violent. "Intensity" can be measured by the number of legal interventions that have occurred even where the stalking continues.

Dr. Souza was particularly concerned by Markley's lack of insight into what she needs to do to manage her risk. He explained that Markley had a significant history of failure on conditional release and upon release from prison. He worried that Markley did not share her reemerging delusions with treatment staff at Sylmar, where she was under a high level of

9

supervision and had to participate in daily treatment. Souza also noted that when asked what Markley believed would be her greatest challenges if discharged to a lower level of care, she did not identify her potential for reemerging delusional beliefs, psychiatric decompensation due to the stressors of community living, or potential feelings of loneliness or isolation. Souza was also troubled by her lack of concern about being discharged to the same city where Richard previously lived.

  c. *Dr. Jenna Tomei*

  As its final witness, the People called Dr. Jenna Tomei, a senior psychologist at Patton in the forensic evaluation department who interviewed Markley on two occasions. Tomei opined that as of her June 2021 report, Markley posed a "substantial risk of harm to others" if released because of Markley's risk factors. Markley did not have a history of violence, which is a "big" risk factor of future violence. But she had other risk factors associated with an increased risk for violent behavior, including her lacking insight, still exhibiting symptoms of her mental disorder, and her "problematic" release plan.

  As to Markley's lacking insight, Dr. Tomei believed she had made progress and had "some understanding" of her delusional disorder, but she did not understand her narcissistic personality disorder and its role. Markley was unable to identify some of the stressors she might encounter in the community and how she might manage those appropriately. When Tomei asked Markley how participating in a program in San Diego might be a "trigger" for her because of Richard being from the same area, she responded that it would "not be an issue," and she would not discuss how she might manage the situation if it did become a problem.

10

Dr. Tomei explained that if Markley were released and stopped participating in her treatment, she could stop taking her medication, start experiencing more symptoms, and start feeling the desire to reach out to Richard. If Richard did not reciprocate, Markley's delusions "could potentially progress to aggression and/or violence."

2. *Markley's Experts*

a. *Dr. Azhar Abdullah*

Markley called her Patton treating psychiatrist, Dr. Azhar Abdullah. Abdullah's primary duty is to make sure Markley is on the right medication with no side effects. Abdullah denied having seen anything indicating that Markley could become violent and recommended that she be discharged to the community.

On cross-examination, Dr. Abdullah testified that Markley was "cured from delusion now" or that it was in remission. And Abdullah believed Markley would respond to treatment in the community "fine," despite her personality disorder. Abdullah attributed the remission to Markley's insight into her problem since approximately mid-2020 or mid-2021—that she acknowledged her medication was effective and would continue taking it.

Dr. Abdullah explained that she changed Markley's Risperdal dose from one to three milligrams, which has been her dose for the last two years. According to Abdullah, erotomanic delusions "decrease[ ] with increasing age," and Markley's behavior the last two years indicated that she is more mature. Abdullah explained that Markley was initially resistant to increasing her Risperdal to three milligrams because she had been reading about the medication and was concerned about side effects.

11

Dr. Abdullah cosigned May 1, 2020 and November 3, 2020 reports for Markley agreeing that she was not ready for outpatient treatment. Abdullah clarified that she did not agree with the reports' recommendations but that generally, Patton psychiatrists sign the reports and cannot reject them.

The court conducted further questioning of Dr. Abdullah, who estimated she interacted with Markley about three to four times a month for more than ten minutes at a time. Abdullah testified that for the last two years, she did not hear anything "abnormal" about Markley from her treatment team.

Dr. Abdullah noted that, in 2019, Markley had a seizure and was treated with Keppra, an antiepileptic. She theorized that because antiepileptics are mood stabilizers, the medication further helps Markley decrease impulsivity and stabilize her mood.

b. *Dr. Daniel Rubin*

Markley called Dr. Daniel Rubin, the intake coordinator for Senior Impact and a licensed psychologist. Senior Impact approved Markley for its mental health case management program in San Diego because it felt she was an appropriate candidate for the program's services. Rubin testified that she informed Senior Impact about her hospitalization for stalking a victim, whom she falsely believed had a romantic connection with her. Markley indicated to Senior Impact that these had been delusional thoughts, that the medication she was taking controlled the delusions, and that she was stable on the medication. Rubin was not aware of Markley's prior delusions at Sylmar in 2018. Although he had worked with other individuals who had delusional disorders, he did not recall if any of those individuals had stalking behaviors.

12

### c. *Dr. Alma Carpio*

Markley next called Dr. Alma Carpio, a psychologist who interviewed Markley for approximately three hours. Carpio reviewed Markley's records from December 2020 through July 2021 and found no evidence of any overt symptoms of psychosis or delusions, nor any evidence of dangerousness. She concluded Markley did not meet the criteria for extension of her commitment.

On cross-examination, Dr. Carpio admitted that in her prior evaluation in September 2020, she concluded Markley met the criteria for extension. Carpio identified the recent increase in Markley's medication dosage as the basis for her prior opinion. Markley had only recently agreed to increasing her medication to a therapeutic dose in approximately March 2020, and as of September 2020, Carpio did not feel enough time had passed to conclude she was in remission. She preferred to see at least a year of a medication change and stability before concluding that a patient was in remission and would consistently take the medication.

Upon further questioning by the court, Dr. Carpio explained the bases for his present conclusion that Markley was no longer a substantial danger to others: (1) her symptoms of delusional disorder had been in remission for at least 16 months; (2) for at least this period, she had no symptoms of assaultive behavior, aggressiveness, threats, or contacts with her victim; (3) there had not been any further documentation of any somatic delusions; and (4) she had been compliant with taking her medication since March 2020.

### d. *Dr. Valerie Rice*

Markley next called Dr. Valerie Rice, a psychologist with whom she had met approximately three times. As of her August 2021 report and the date of trial, Rice concluded Markley did not pose a substantial danger to others if released into the community.

On cross-examination, Dr. Rice admitted authoring a prior report in September 2020 in which she believed Markley still met the criteria for re-extension. She explained that, back in September 2020, Markley had a fairly recent medication change and had expressed some resistance to increasing her dosage. Rice had been concerned that, without being appropriately medicated, Markley's erotomanic delusions might not be under control and that, if released, she would be at a higher risk of stalking activity similar to her prior offense. She characterized the recent medication change as being "really [her] only concern" at the time of her September 2020 report.

For the most recent August 2021 report, Dr. Rice reviewed Markley's records and did not believe Markley's narcissistic personality disorder would substantially interfere with her progress. According to Rice, Markley complied with treatment and was doing pretty much everything she needed to do, and she saw no evidence that Markley was noncompliant with taking her medication. Although Rice acknowledged that Markley would probably always have her personality disorder, she did not think it would interfere with Markley's treatment or make Markley dangerous if released into society.

### 3. *Court's Ruling*

At the conclusion of the testimony, the court issued its oral ruling granting the Petition extending Markley's commitment to August 10, 2022.

The court found that the People proved Markley has a mental disorder, and that as a result of that mental disorder, she poses a substantial danger of physical harm to others and has "serious difficulty controlling her behavior." According to the court, the case was unusual because there was no evidence Markley ever physically harmed Richard or anyone else. It noted "the one alarming comment, 'I could just kill him,' from over a decade ago," but went

14

on to explain that "more than anything physically harmful Markley has done, the court is persuaded by what has been described as the intensity and chronicity of the stalking behavior"—that despite restraining orders, multiple arrests, convictions, and incarcerations, she continued to contact Richard, even from a controlled, locked hospital setting at Sylmar.

The court credited Dr. Souza's testimony "that stalking is nonviolent until it isn't." In the court's view, because Drs. Carpio and Rice found Markley met the criteria for extension back in September 2020, they had conceded Markley's mental disorder, if untreated, "renders her dangerous." The court characterized this concession as meaning that Carpio and Rice agreed with Drs. Ng, Souza, and Tomei that Markley's mental condition creates a substantial danger of physical harm.

The court next considered and rejected Markley's affirmative defense that she no longer poses a substantial danger of physical harm because (1) she is taking medication that controls her mental disorder and (2) she will continue to take that medication in an unsupervised environment. According to the court, Markley failed to carry her burden to demonstrate that she would continue to take her medication.

Markley appealed.

D. *Subsequent Commitment Extension Proceedings*

On April 4, 2022, the People filed another petition (Second Petition) to extend Markley's commitment from August 10, 2022 to August 10, 2024. On July 15, 2022—while Markley's appeal of the prior commitment extension to August 10, 2022 remained pending—the trial court heard argument on the

15

People's Second Petition.[5]  Markley, who was represented by counsel, waived her right to a jury trial and agreed to the two-year extension of her commitment.  The trial court then granted the Second Petition and extended Markley's commitment to August 10, 2024.

## DISCUSSION

We begin by addressing the threshold question whether Markley's appeal of the 2020 recommitment order is mooted by the court's subsequent 2022 recommitment order.  Concluding that the appeal is not moot, we move on to consider Markley's substantive contentions that (1) substantial evidence did not support the 2020 recommitment order, and (2) double jeopardy principles preclude any reliance on the later 2022 order.

A.    *Mootness*

Because Markley's appeal concerns a commitment extension order that expired on August 10, 2022, and her commitment has since been extended to August 10, 2024, we must first consider whether her appeal is moot.  She contends, and the People concede, that her appeal is still justiciable.  We agree.

All commitment proceedings following a defendant's initial commitment for NGI are recommitments.  (§ 1026.5, subd. (b)(1).)  Thus, if we conclude there was insufficient evidence to support Markley's recommitment to August 10, 2022, then the trial court lacked jurisdiction to issue her subsequent recommitment to August 10, 2024.  In other words, because there

---

5    On November 10, 2022, we granted the People's motion to augment the record on appeal with these two documents.  We then granted Markley's request that the parties provide supplemental briefing addressing the relevance of those documents.

16

cannot be a valid extension of an invalid recommitment, Markley's appeal of her now-expired recommitment to August 10, 2022 is not moot. (Cf. *People v. Rish* (2008) 163 Cal.App.4th 1370, 1380 ["[A] case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief."].)

Courts have followed this reasoning in analogous cases involving expired commitment orders for mentally disordered offenders (MDOs) (§ 2970). (See e.g., *People v. Fernandez* (1999) 70 Cal.App.4th 117, 134–135 ["[T]he appeal is not moot because our decision may still affect the lower court's right to continue jurisdiction under the original commitment as well as the recommitment."]; *People v. J.S.* (2014) 229 Cal.App.4th 163, 174 ["[I]f the initial commitment period expires before the timely filed petition is heard by the court, the petition is not rendered moot unless and until the offender's involuntary treatment is discontinued"].)[6]

Moreover, we agree with Markley that, if we reverse the recommitment order to August 10, 2022 as unsupported by substantial evidence, then double jeopardy would apply to bar any subsequent extension of her commitment. (See *People v. Cheatham* (2022) 82 Cal.App.5th 782, 797–800 (*Cheatham*).)

---

[6] We agree with the parties that *People v. Redus* (2020) 54 Cal.App.5th 998, 1009 (*Redus*) is not persuasive. *Redus* reasoned that the defendant's appeal from an expired recommitment order under section 1026.5 was moot because it concerned the validity of a recommitment order, while the MDO cases, including *Fernandez* and *J.S.*, instead concerned the validity of an initial commitment order. (*Redus*, at p. 1009.) But this is a distinction without a difference for mootness purposes. Each recommitment proceeding under section 1026.5 independently assesses each committee's current dangerousness. (*People v. Kipp* (1986) 187 Cal.App.3d 748, 751.) And as Markley posits, there cannot be a valid extension of an invalid commitment, regardless of whether that invalid commitment was an initial one or a recommitment.

Although the People contend that double jeopardy does not apply to section 1026.5 based on the reasoning of *People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477, 481 and *Hudec v. Superior Court* (2015) 60 Cal.4th 815 (*Hudec*), we do not find this line of authorities persuasive on this issue. In *Cheatham*, our colleagues in the Third Appellate District recently considered and rejected these very arguments premised on *Williams* and *Hudec*, concluding instead that double jeopardy applies to preclude retrial where an NGI recommitment order is reversed for insufficient evidence. Because we find the analysis in *Cheatham* to be thoughtful and well-supported, we adopt its reasoning here. Accordingly, we turn to the merits of Markley's appeal.

B.    *Sufficiency of the Evidence*

Markley contends the court's order extending her commitment to August 10, 2022 under section 1026.5, subdivision (b) must be reversed because there is insufficient evidence supporting the court's finding that due to her mental disorder she poses a substantial danger of physical harm to others. We agree.[7]

Under section 1026.5, a person who is found NGI may be committed to a state hospital for a period no longer than the maximum prison sentence for his or her offenses. (§§ 1026, 1026.5, subd. (a)(1).) This commitment may be extended in up to two-year increments if, because "of a mental disease, defect, or disorder, [the person] represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1), (8).) To establish the substantial danger of physical harm element, the prosecution must prove beyond a reasonable

---

[7]    "[W]e review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt." (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165 (*Zapisek*).)

doubt that the person has, " 'at the very least, serious difficulty controlling his [or her] potentially dangerous behavior.' " (*Redus*, *supra*, 54 Cal.App.5th at p. 1010, quoting *Zapisek*, *supra*, 147 Cal.App.4th at p. 1165; *People v. Williams* (2015) 242 Cal.App.4th 861, 872; § 1026.5, subd. (b)(7).)

Here, expert testimony established, and the parties agree, that Markley has a mental disorder. Specifically, they agree that, before Markley's dosage increase to three milligrams of Risperdal, she struggled to manage her symptoms—including her erotomanic delusions that led her to contact and stalk Richard. And the parties further agree that if Markley were to stop taking her medication, her symptoms would likely recur. For purposes of this appeal, then, we assume there is a substantial risk Markley would stop taking her medication upon release and that her symptoms—including her delusions—would likely reemerge. Thus, we consider whether any reasonable trier of fact could find beyond a reasonable doubt that Markley, *without* the benefit of her medication, would pose a substantial danger of physical harm to others because of her mental disorder.

As we have already noted, the People's expert witnesses concluded that Markley would do so. To a person they reasoned that if Markley discontinued her medication and treatment, her delusions would likely rematerialize and she would engage in stalking that could potentially escalate into physical violence, particularly when faced with active rejection by Richard. As evidence that Markley had and continues to have "serious difficulties controlling her behavior," Dr. Ng emphasized the Sylmar incident during which Markley repeatedly called Richard because of her delusions. The People's other experts appeared to share this sentiment.

But difficulty controlling one's delusional behavior caused by a mental health disorder was not the operative question. The question before the court

19

was whether Markley posed a substantial danger of *physical harm* to others. (§ 1026.5, subd. (b)(1); see, e.g., *Cheatham*, *supra*, 82 Cal.App.5th at p. 790 [psychologist's testimony that defendant " 'has serious difficulty controlling his behaviors' generally, not that he had serious difficulty controlling his *dangerous* behavior," was insufficient evidence for section 1026.5].) Without evidence that Markley ever presented a physical danger to Richard in the first place, the record did not support a nonspeculative finding of dangerousness. Here, the record shows that 70-year-old Markley has never engaged in physically violent behavior—whether during the late 1990s when the stalking began; in the face of repeated rejections by Richard and his family following multiple arrests, a restraining order, probation, and prison time; or at any point during her more than decade-long commitment at Patton. Nor is there any evidence that Markley has ever been physically aggressive with Richard or anyone else over this nearly 25-year period, regardless of her medication treatment status and relapses, and in spite of the number of times Richard has rejected her.

Not a single expert was aware of any instances during which Markley had behaved violently or aggressively. Indeed, as the court acknowledged, the *only* arguable threat of harm Markley ever made occurred in 1999, when she purportedly told one of Richard's employees that she "could just kill [Richard]." Without more, this statement from decades ago discounted by the trial court is not substantial evidence that Markley represents the requisite risk of inflicting physical harm to justify her recommitment. (See *People v. Johnson* (1980) 26 Cal.3d 557, 578 [Evidence is "substantial" when it is "reasonable, credible, and of solid value."]; *People v. Morrison* (2004) 34 Cal.4th 698, 711 [evidence that "leads only to speculative inferences" is irrelevant evidence].)

Although the People emphasize their experts' apparent conclusion that some individuals who experience delusions and have a stalking history like Markley's *can* have serious difficulty controlling their dangerous behavior if their delusions recur, these experts failed to adequately link that conclusion to Markley.[8] Instead, the experts' reasoning centered around various factors indicating why it was medically necessary for Markley to continue her treatment, not on the circumstances supporting the legal conclusion that she was likely to inflict physical harm on others. For example, the experts voiced concerns about Markley's ongoing "lack of insight" into her mental disorder, the fact that her narcissistic personality disorder caused her to believe she was more knowledgeable than others and was a barrier to her mental health treatment, and that she still did not appreciate the challenges posed by her release to the same city as Richard. We accept that Markley is not cured of her mental disorder and that, from a medical perspective, she requires additional treatment before being released. Importantly, however, the standard of care for treating Markley and whether she requires further medical intervention is not the same question as whether, under the law governing section 1026.5, her commitment must be extended.

Dr. Souza's testimony does not change our conclusion. Although the trial court appears to have found compelling Souza's opinion that "stalking behavior is not violence until it is," the fact that stalking has the *potential* to become violent is not substantial evidence that Markley poses a *substantial*

_____

8 We further observe that some of the People's key evidence was seemingly contradictory. Dr. Ng, for example, struggled to explain how she could agree with her colleague's conclusion using a different stalking risk assessment that Markley had a *low* risk of her stalking behavior escalating into physical violence, while also simultaneously concluding that, using the HCR-20 as a "guide," there was a *high* risk Markley's stalking behavior could escalate into physical violence.

21

danger of physical harm to others, particularly absent any indication she has a violent history. A similar problem is presented by Souza's testimony that the "intensity and chronicity" of Markley's past stalking behavior and her low level of insight are factors increasing the risk that her stalking could become violent. Although an increase in this risk is relevant, the question becomes *to what extent* does that risk increase? As Markley contends, testimony that these factors generally increase the risk of violence, without any suggestion as to the magnitude of that risk increase, does not automatically render the resulting danger "substantial" within the meaning of section 1026.5.

Moreover, Dr. Souza admitted that the HCR-20 defines "violence" as a victim's intense fear for their physical well-being or intense psychological fear. But this definition is problematic. We have found no authority to suggest that "a substantial danger of physical harm" under section 1026.5, subdivision (b)(1) was meant to encompass the risk of causing emotional distress to the victim.[9] Because it is the job of the Legislature, not medical experts, to define the risk required for recommitment, the experts' conclusions that Markley stands at high or increased risk of "violence" based on this aspect of the HCR-20 is not substantial evidence supporting the recommitment decision.[10]

_____

[9]     Significantly, the stalking statute (§ 646.9) is not limited to express or implied threats to the victim's *physical* safety. (*People v. Borrelli* (2000) 77 Cal.App.4th 703, 719.)

[10]     Our dissenting colleague agrees that "a substantial danger of *physical* harm" under section 1026.5, subdivision (b)(1) does not include psychological fear as described by Dr. Souza, yet "do[es] not read the relevant parts of Dr. Souza's testimony to depend on that [improper] definition." (Dis. opn., *post*, at p. 5.) But to the extent Souza's testimony is at all ambiguous, it was the prosecution's burden to clarify that *their expert's* conclusion was based on the proper standard rather than an improper one.

22

The People further contend, and we agree, that a single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5. (*Zapisek*, *supra*, 242 Cal.App.4th at p. 1165.) But "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence." ' " (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504.) That is precisely the problem here. As we have discussed, the opinions of the People's medical experts were not grounded in relevant facts probative of Markley's risk under section 1026.5. And the experts failed to connect their observation—that individuals with Markley's mental health disorder and stalking history can have a high or increased risk of violence—to their ultimate conclusion—that *Markley* represented such a danger. Rather, they merely parroted the legal standard of section 1026.5 that, due to her mental disorder, she posed a substantial danger of physical harm to others.

Our conclusion is strongly supported by the Third Appellate District's opinion in *Cheatham*, *supra*, 82 Cal.App.5th 782. After Cheatham hallucinated voices saying that police planned to shoot him, he fled criminal custody and resisted an officer. Found NGI, he was committed to a state hospital. At a later trial on a section 1026.5 petition to extend Cheatham's commitment, psychologists testified that if released, Cheatham would pose the requisite substantial risk of physical harm under section 1026.5 because, should he stop taking his medications and hear similar voices threatening to harm him, he could become dangerous. The trial court granted the petition and extended Cheatham's commitment. (*Cheatham,* at p. 785.)

The Court of Appeal reversed, reasoning in part that the psychologists failed to connect their conclusion—that some individuals with Cheatham's

23

mental disorder could become violent—to Cheatham's risk of becoming violent. In evaluating the evidence, the court accepted that there was a substantial risk Cheatham would stop taking his medications and that his hallucinations would likely increase. (*Cheatham*, *supra*, 82 Cal.App.5th at p. 789.) However, it found there was insufficient evidence that Cheatham had serious difficulty controlling his *dangerous* behavior. Central to the court's holding was the fact that "the record include[d] not one instance in which Cheatham evidenced any propensity to engage in dangerous or threatening behavior toward others because of his mental disorder." (*Id.* at p. 790.) Thus, the court reasoned, no reasonable juror could "make the leap" to conclude that because Cheatham would have difficulty controlling his behaviors in response to his hallucinations, "he also would have serious difficulty controlling *dangerous* behavior." (*Id.* at p. 791.)

Such is the case here. As in *Cheatham*, we assume there is a substantial risk Markley will discontinue her medication and that her delusions will recur. Yet, like the record in *Cheatham*, our record here is devoid of evidence indicating that Markley has ever engaged in "dangerous behavior" or has the propensity to do so.[11] Just as the court observed in *Cheatham*, no reasonable factfinder here could "make the leap" that because some individuals with Markley's history and disorder are more likely to behave violently, Markley herself has serious difficulty controlling her dangerous behavior. (*Cheatham*, *supra*, 82 Cal.App.5th at pp. 791–792; see also *People v. Johnson* (2020) 55 Cal.App.5th 96, 109.)

---

11    We are aware of Markley's purported comment that she "could just kill [Richard]." But as noted previously, this can hardly be called substantial evidence of her propensity to behave violently, considering Markley made this comment several decades ago, and there is no indication in the record that she planned to act on her comment then, much less now.

The People try to distinguish *Cheatham* on the grounds that there is no dispute about Markley's need to continue taking her medication to "control her delusional behavior." We are not persuaded, however, because the same was true in *Cheatham*: the appellate court assumed that upon release, there was a substantial risk Cheatham would discontinue his medications and that his hallucinations would increase. (*Cheatham*, *supra*, 82 Cal.App.5th at p. 790.) But the court found there was insufficient evidence Cheatham would have difficulty controlling *dangerous* behavior in response to those hallucinations because there was no evidence he had ever engaged in or had a propensity to engage in dangerous behavior in the first place. (*Id.* at p. 792.)

*Redus* reached a similar result. There the court reversed a commitment extension for insufficient evidence. Despite the NGI defendant's continuing delusions and lack of insight about a murder he had long ago committed, there was no "hint of violence, threatening behavior, or aggressiveness of any kind . . . over multiple decades, even through CONREP releases and medication lapses." (*Redus, supra,* 54 Cal.App.5th at p. 1012.) Here, the factual disconnect is even more stark because Markley's previous delusions had never before led to any kind of physical violence. (Compare *Zapisek, supra*, 147 Cal.App.4th at p. 1166 [substantial evidence supported court's finding that Zapisek had difficulty controlling his potentially dangerous behavior where, "[m]ost importantly, the experts agreed that [Zapisek]'s delusions were of the same type as those he experienced when he committed the 1997 assault"].)

As observed in *Cheatham*, "[a] serious mental disorder in and of itself cannot justify an extension of [a] commitment. To find otherwise would justify indefinite involuntary commitments for all those who have a serious

mental disorder without regard to the actual risk of [physical] harm they pose to others because of their disorder." *Cheatham*, *supra*, 82 Cal.App.5th at p. 794. The same concern applies here. Because this record lacks sufficient evidence linking Markley's ongoing mental disorder with the experts' conclusion that she purportedly poses a substantial danger of physical harm to others and has serious difficulty controlling her dangerous behavior, we reverse.

C.      *Validity of the Subsequent Recommitment Order*

As discussed previously, double jeopardy applies here where a recommitment order is reversed for insufficient evidence. (*Cheatham*, *supra*, 82 Cal.App.5th at p. 797–800.) Accordingly, the recommitment to August 10, 2024 was an extension of an invalid recommitment order and should be dismissed. Markley observes, and we agree, that on remand she will have "the opportunity to go back to the trial court and argue that any subsequent recommitment petition should be dismissed."

## DISPOSITION

The order extending Markley's commitment to August 10, 2022 is reversed.

DATO, J.

I CONCUR:

BUCHANAN, J.

26

Irion, J., Dissenting.

I dissent because the majority improperly second guesses the informed professional conclusions of three different psychologists. The psychologists used an accepted risk assessment tool, the HCR-20, and considered Markley's *specific* history and *specific* mental health conditions, to conclude that Markley's delusional stalking behavior is *dangerous* behavior that presents a substantial danger of physical harm to others. I therefore cannot agree that the psychologists' opinions were based on " ' " 'guess, surmise or conjecture, rather than relevant, probative facts.' " ' " (Maj. opn., *ante*, at p. 23.)

At trial, the People were required to prove beyond a reasonable doubt that, because of her "mental disease, defect, or disorder," Markley (1) "represents a substantial danger of physical harm to others" (Pen. Code, § 1026.5, subd. (b)(1)); and, as constitutionally required, (2) has "serious difficulty *controlling* [her] potentially dangerous behavior." (*People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165, italics added.) The dispute in this appeal centers on the first issue, namely, whether substantial evidence supports a finding that Markley "represents a substantial danger of physical harm to others." (Pen. Code, § 1026.5, subd. (b)(1).) If the evidence fails on that issue, then it also fails on the second issue because the element of potentially *dangerous* behavior would be missing.[1] The fundamental question, therefore, is whether a substantial risk exists that Markley will physically harm another person if she is released, stops taking her medication, and resumes her stalking of Richard.

---

[1]  As the opening appellate brief explains regarding the second issue, Markley's position is that she "doesn't have difficulty *controlling* her physically dangerous behavior because she doesn't *have* physically dangerous behavior." (Italics added.)

1

The majority concludes that the evidence does not support such a finding because there is no "evidence that Markley *ever* presented a physical danger to Richard *in the first place*." (Maj. opn., *ante*, at p. 20, italics added.) According to the majority, Markley may be a stalker, but there is no evidence she ever has been, or will be, a *dangerous* stalker. My colleagues reach this conclusion in two steps. First, they point out that Markley has never been physically violent toward Richard or anyone else. Second, they discount the opinions of the three psychologists who opined Markley poses a substantial risk of physical harm despite the absence of any history of violence. According to my colleagues, those psychologists were "merely parrot[ing] the legal standard," and their opinions "were not grounded in relevant facts probative of Markley's risk" but rather on " ' " 'guess, surmise or conjecture.' " ' " (Maj. opn., *ante*, at p. 23.) As I will explain, I disagree with that description of the psychologists' testimony.

A. *The Testimony of Dr. Souza, Dr. Ng, and Dr. Tomei*

   1. *Dr. Souza*

The psychologist who went into the most detail about the risk of physical harm posed by Markley was Dr. Souza. As Dr. Souza explained, he has special expertise in applying the HCR-20 risk assessment tool because he is "one of the few who have been trained in the country . . . to train others on the [HCR-20, version 3], which is the gold standard instrument to conduct violence risk assessments," with "a good portion" of his time spent "training others on . . . violence risk assessment." Dr. Souza explained that the HCR-20 "uses empirically-supported risk factors to determine someone's violence risk," and he confirmed that he used the HCR-20 to assess Markley's risk of violence.

2

Specifically, Dr. Souza authored a report dated November 4, 2021, for the purpose of assessing whether Markley would pose "a serious risk of physical harm to others if [she was] receiving treatment in the community." Dr. Souza interviewed Markley and reviewed her charts, her past evaluations, and her long history of stalking Richard. He concluded that Markley was not suitable for outpatient treatment because of the level of risk that she would engage in physical violence to others. When asked to explain why he came to that conclusion despite no past history of violence, he explained that "stalking, it is a very unique type of violence" "in that stalking behavior is not violence until it is." He explained that "unfortunately, with Ms. Markley's case, there has been such a consistent and intense delusional obsession with her victim, despite many, many legal problems, years of hospitalization, years of incarceration, that this level of delusional attachment raises a lot of concerns of what may occur if she experiences active rejection from her victim." According to Dr. Souza, although Markley's stalking behavior "has never culminated in violence in the past, it is a behavior that does contribute to the violence quite often in the community if . . . there is no intervention prior to that one moment of violence."

After the parties questioned Dr. Souza, the trial court posed questions of its own to Dr. Souza about his use of the HCR-20 to conclude that Markley poses "a serious risk of physical harm to others." The trial court asked Dr. Souza to address "[w]hat percentage of persistent stalkers like Ms. Markley escalate to physical harm of a victim." Dr. Souza answered, "When it comes to actual violence escalating with stalking behaviors, it really is dependent on the intensity and chronicity of the stalking. [¶] So essentially, the longer you see the stalking behavior occur and the more intensity of the stalking behavior—an intensity can be measured by how many legal interventions

3

have occurred and the stalking has continued.  That's usually when we see an increase in the level of violent outcomes.  [¶]  So I can't provide a percentage just because there is so many variables that go into it, but what we do look at that generally increases the risk for stalking behavior is, how long has it occurred?  How many interventions have occurred that have failed?  And are there additional factors that contribute to the stalking, and so something such as a delusional disorder?"  The trial court followed up and asked "what . . . factors" other than "intensity and chronicity . . . differentiate stalking that becomes violent and stalking that doesn't."

Dr. Souza answered, "And so that becomes very case specific.  And so this is where it is some measure like the HCR-20 really steps in to provide strength, because all the factors that are on HCR-20 have been shown to predict violence across types of crime; so it is predictive both for crimes, for example, arson, murder, and stuff like stalking.  [¶]  So other factors very important are level of insight into the nature of their offense, level of insight into the management services that they will require to manage their own level of risk, and also insight into the previous failures of conditional release with supervision."

The trial court did not ask Dr. Souza to connect his identification of those factors to the specific details of Markley's case.  However, it is clear from Dr. Souza's testimony that when he performed his analysis using the HCR-20, he was aware of the details of Markley's case, and he conducted his analysis using those details.  The question he sought to answer in his report was whether Markley poses "a serious risk of physical harm to others."  Dr. Souza concluded that Markley did pose such a risk.

Moreover, although Dr. Souza explained that the HCR-20 uses a definition of violence that is broader than the statutory standard, in that it

4

includes *psychological* harm rather than only *physical* harm, I do not read the relevant parts of Dr. Souza's testimony to depend on that definition. Dr. Souza's testimony therefore provides substantial evidence for a finding that Markley poses a substantial danger of physical risk to others.

### 2. *Dr. Ng*

Dr. Ng also performed an analysis using the structure of the HCR-20 to guide her risk assessment evaluation, which she based on a detailed knowledge of Markley's history and mental conditions. Dr. Ng authored a report dated December 31, 2021, in which she concluded that Markley met the requirements for extension of her commitment. Based on her familiarity with the details of Markley's case, Dr. Ng stated her opinion that "by reason of her mental disease, defect, or disorder of—delusional disorder and narcissistic personality disorder, [Markley] does represent a substantial danger of physical harm to others." She explained that "in our review of her records and her past history of repeatedly showing up to the victim's home, harassing him, made verbal threats against him, there is . . . a high risk that can escalate into physical harm." During her testimony, Dr. Ng discussed each of the three categories of factors used in an HCR-20 analysis (historical factors, clinical factors, and risk management factors), with a lengthy explanation of how those factors related to the specific details of Markley's situation.

When the trial court questioned Dr. Ng as to whether, in her opinion, Markley would pose a "low, medium, or high risk of causing physical harm to another" if released to the community, Dr. Ng explained that if Markley's "mental status" changed while in the community based on lack of "adequate support supervision [and] medication management, it can change from low all the way up to high." Dr. Ng's testimony thus provides substantial

5

evidence to support a finding that, based on the assumption endorsed by the majority that Markley will stop taking her medication and relapse into stalking behavior if released, Markley poses a substantial danger of physical harm to others.

3.  *Dr. Tomei*

Dr. Tomei prepared an evaluation in June 2021 addressing whether Markley should be released to community outpatient treatment, concluding she should not. Dr. Tomei based her evaluation on an interview with Markley, a review of Markley's legal and medical records, and consultation with Markley's treatment team. Dr. Tomei explained that she specifically addressed the issue of whether Markley would be "a substantial harm to others."

Dr. Tomei was asked, "What is the basis for your opinion that Ms. Markley would pose a risk of substantial harm to others, notwithstanding the fact that there was no violence involved in the underlying offense?" She replied, "Ms. Markley doesn't have a history of violence, and that certainly is a big risk factor for future violence; however, she does present with other factors that have been shown to increase someone's risk for violent behavior, some of the ones I discussed, such as problems with insight, continued symptoms of a major mental illness, of a problematic release plan. Things like that." Dr. Tomei explained that Markley was at risk of resuming her stalking behavior and "feeling the desire to reach out to the victim," and "if that was not reciprocated, it could potentially progress to aggression and/or violence."

Although Dr. Tomei was not asked whether she used any specific risk assessment tool, such as the HCR-20, her conclusion as a psychologist with specific knowledge of Markley's circumstance provides substantial evidence

6

for a finding that Markley poses a substantial danger of physical harm to others.

B.      *The Psychologists' Conclusions Were Not Based on Guess, Surmise or Conjecture, But Rather on Relevant Probative Facts*

The majority dismisses the conclusion of the three psychologists by characterizing their testimony as merely observing that "some individuals who experience delusions and have a stalking history like Markley's *can* have serious difficulty controlling their dangerous behavior if their delusions recur," but "fail[ing] to adequately link that conclusion to Markley." (Maj. opn., *ante*, at p. 21.) Put another way, the majority concludes that the psychologists "failed to connect their observation—that individuals with Markley's mental health disorder and stalking history can have a high or increased risk of violence—to their ultimate conclusion—that Markley represented such a danger." (Maj. opn., *ante*, at p. 23.)

The testimony I have detailed above does not square with the majority's characterization. Each of the psychologists focused on Markley's specific history and mental conditions to conclude that she posed a substantial danger of physical harm to others. For example, as Dr. Souza explained, "with Ms. Markley's case, there has been such a consistent and intense delusional obsession with her victim, despite many, many legal problems, years of hospitalization, years of incarceration, that this level of delusional attachment raises a lot of concerns of what may occur if she experiences active rejection from her victim." Dr. Ng testified, "in our review of her records and her past history of repeatedly showing up to the victim's home, harassing him, made verbal threats against him, there is—there is a high risk that can escalate into physical harm." Both of those witnesses used their expertise as psychologists, assisted by the HCR-20, to specifically link

7

the facts of Markley's case to their conclusion that Markley poses a substantial danger of physical harm to others.

The majority recognizes that "[a] single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under [Penal Code] section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 879.) Moreover, in a substantial evidence review, "[i]t is not the role of this court to redetermine the credibility of experts" (*People v. Poe* (1999) 74 Cal.App.4th 826, 831), " 'for it is the exclusive province of the trial judge or jury to determine the credibility of a witness' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162). However, my colleagues contend that those rules are not dispositive here because of the legal principle set forth in *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504 (*Anthony C.*), namely, that "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence." ' " As I will explain, however, the use that the majority makes of the *Anthony C.* language stretches it far beyond how it was used in that case, transforming a substantial evidence review into an impermissible second-guessing of well-informed expert opinion.

In *Anthony C.*, an expert prepared a formal risk assessment to determine whether to extend the civil commitment of a juvenile sex offender. (*Anthony C., supra*, 138 Cal.App.4th at p. 1506.) A recommitment required a finding that the appellant " 'would be physically dangerous to the public' " and has "serious difficulty controlling his dangerous behavior." (*Id.* at p. 1503.) The expert who prepared the formal risk assessment was unable to testify as scheduled. Therefore, a different expert, Dr. Herskovic, was asked to review the first expert's report and testify regarding the appellant's risk of

8

reoffending. (*Id.* at pp. 1506-1507.) Dr. Herskovic "was unable to recall many of the relevant risk factors bearing" on the risk of reoffense and was unsure of the level of risk posed to the community if the appellant were released. (*Id.* at p. 1507.) *Anthony C.* concluded, "This testimony does not constitute substantial evidence that [the appellant] has serious difficulty controlling his behavior. In light of Dr. Herskovic's failure to prepare a formal risk assessment evaluation, his lack of preparation, and his inability to state the risk factors at trial, his reluctance to quantify how high a risk [the appellant] posed *without further study* strongly suggests his opinion *was based as much on guesswork, surmise or conjecture as on relevant probative facts.* [Citation.] As such, his testimony is not a basis upon which to establish proof beyond a reasonable doubt." (*Ibid.*, italics added.) In short, *Anthony C.* concluded that the expert based his opinion on "guesswork, surmise or conjecture" because he was not involved in the relevant analysis and could not explain the basis for the conclusion.

Here, in contrast, the three psychologists who reached conclusions about Markley's dangerousness were the professionals who *personally* conducted the evaluations based on their understanding of Markley's specific history and mental conditions, and they were able to provide detailed testimony about how they reached their conclusions. Where, as here, a mental health professional's conclusion is based on the particular facts of the case and premised on accepted risk assessment tools, such as the HCR-20, it cannot fairly be described as based on "guesswork, surmise or conjecture" as that phrase was used in *Anthony C.*

In several recent opinions, the *Anthony C.* language has been cited and relied upon as a basic component of the legal standards that apply when an appellate court reviews a finding that a person represents a substantial

9

danger of physical harm to others. (*People v. Cheatham* (2022) 82 Cal.App.5th 782, 791 [citing *Anthony C.* to reject what the appellate court characterized as "an *unsupported* psychiatric opinion" that the appellant had serious difficulty controlling his dangerous behavior]; *People v. Redus* (2020) 54 Cal.App.5th 998, 1013 [citing *Anthony C.* in concluding that substantial evidence did not support a finding that the appellant had serious difficulty controlling his potentially dangerous behavior]; *People v. Johnson* (2020) 55 Cal.App.5th 96, 110, fn. 5 [citing *Anthony C.* in reversing a finding that a mentally disordered offender represented a substantial danger of physical harm]; see also *People v. Kerbs* (Jan. 28, 2020, A155126) opn. ordered nonpub. Apr. 15, 2020, S261125 [relying on *Anthony C.* to reverse a finding of dangerousness in a recommitment proceeding under Pen. Code, § 1026.5, subd. (b)].) Here, the majority's use of the *Anthony C.* language demonstrates the danger of that language taking on a life of its own and being employed in a way that was never intended. I caution against the apparent trend of appellate courts making their own credibility determinations and second-guessing the well-informed conclusions of mental health professionals under the guise of purportedly rejecting "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant, probative facts." ' " (*Anthony C.*, *supra*, 138 Cal.App.4th at p. 1504.)

My colleagues appear to be bothered that the psychologists could not provide a specific quantification of the risk of violence posed by Markley. I have no quarrel with the general rule that "[s]peculation or conjecture alone is not substantial evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) But that principle must be applied with sensitivity to the fact that the task of *predicting* whether someone poses a risk of physical violence to others is by definition a *speculative* undertaking. It is the

10

role of mental health professionals, trained in the application of risk assessment tools, to make such a prediction. Indeed, as our Supreme Court has observed, when future dangerousness is at issue, "expert prediction, *unreliable though it may be*, is often the only evidence available to assist the trier of fact." (*People v. Murtishaw* (1981) 29 Cal.3d 733, 772, italics added [describing commitment proceedings in general].) After hearing a psychologist's testimony about future risk of dangerousness, a trier of fact is free to reject that psychologist's prediction as not credible. But it is indisputably not *our* role, as an appellate court, to second-guess the credibility of a well-informed expert conclusion that is grounded in an accurate understanding of the facts of the case. Here, because the three psychologists used accepted tools of analysis, and they applied those tools to the facts of Markley's case, their expert opinions constitute substantial evidence to support the trial court's finding that the People met their burden to prove that Markley presents a substantial danger of physical harm to others.

IRION, Acting P. J.

11