Filed 6/28/24  City of Arcata v. Watson CA1/1

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF ARCATA,<br><br>      Petitioner and Respondent,<br><br>v.<br><br>BRETT WATSON,<br><br>      Defendant and Appellant. | A167819<br><br>(Humbolt County<br>Super. Ct. No. CV2201490)<br><br>ORDER MODIFYING OPINION<br>  AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on June 11, 2024, be modified as follows:

The last sentence of the first full paragraph on page 4 should read: "K.D. reported Watson for sexual harassment."

The second sentence of the first full paragraph of page 14 is deleted.

The third sentence of the first full paragraph of page 14 should read: "If Watson is a resident, he is entitled to participate in City government and in that capacity may interact with K.D. and other City employees."

Brett Watson's petition for rehearing is denied.

There is no change in the judgment.

Dated:

_____
Humes, P. J.

1

Filed 6/11/24  City of Arcata v. Watson CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| CITY OF ARCATA,<br><br>     Petitioner and Respondent,<br><br>v.<br><br>BRETT WATSON,<br><br>     Defendant and Appellant. | A167819<br><br>(Humbolt County<br>Super. Ct. No. CV2201490) |

Brett Watson appeals from an order granting the City of Arcata's (City) petition for a restraining order under the Workplace Violence Safety Act (Code Civ. Proc., § 527.8) (the Act).[1]  He argues the trial court applied the wrong legal standard, abused its discretion, and its decision is not supported by substantial evidence.  Watson also argues the scope of the order is overbroad and violates his constitutional rights.  We affirm.

## I.  BACKGROUND

Watson was appointed to the city council in April 2017.  At that time, K.D. was the city manager.  The city manager is responsible for the City's day-to-day operations and staff management.  The city manager is supervised by the five-member city council.  The mayor has the most contact with the

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

1

city manager out of all the council members. Watson became the City's mayor in 2019.

Later that year, Watson expressed his strong romantic feelings for K.D. Over the following two years, Watson became increasingly fixated on K.D. and their interactions became more frequent and personal in nature: he would text and call K.D. outside of work hours, including on the weekends and during her vacations; he would go to her office without a scheduled meeting, occasionally interrupting ongoing meetings; and he would ask for long and sustained hugs that became "creepy" and "too long." K.D. described Watson as having his "hooks" in her.

Watson and K.D. would go on regular walks during the COVID-19 lockdown between 2020 and 2021. During their walks, the conversations sometimes concerned City business, but they often devolved into Watson expressing his struggle when he was not in contact with K.D. Those conversations made K.D. feel uncomfortable and "sick." A couple of those conversations resulted in Watson getting very agitated and aggressive; on at least one occasion he screamed at K.D. and made her feel unsafe. K.D. testified that part of the reason they went on walks was to avoid making the other staff uncomfortable with Watson's frequent visits to her office. K.D. also expressed that she felt she could not reject Watson's invitations to go on walks because he was her boss.

K.D. explained that Watson would "manipulate the situation and his role . . . to get me to respond on my vacations and my weekends through a series of guilt, through a series of threats." For example, Watson texted K.D. a smiling emoji during work hours on a Monday in June 2020. Less than two hours later, after no response from K.D., he sent another text where he stated her failure to respond showed a "lack of respect" and was "unacceptable." At

2

the end of the text Watson stated: "We need each other more than ever and I'm not feeling the love being reciprocated when I hear your communications go unanswered." Similarly, on a Saturday in August 2021, Watson texted K.D.: "Thank you for taking time out of your vacation to comfort me. [I'm] hurting so much. I really need you and I'm really grateful. I'm afraid of losing you."

When K.D. attempted to place boundaries on their relationship Watson had extreme reactions. For example, K.D. told Watson that she needed some time and space from him and asked him for a 30-day "break." He responded that all he could give her was two days. Watson also threatened her job security, saying he would call for a closed session to talk about her performance or he would be "cold-blooded" and tell her "everything [she was] doing wrong all the time." On the other end of the spectrum, Watson's reaction would be full of emotion, anguish, begging, and guilting K.D. with horrible things he would do to himself if they stopped talking.

K.D. felt obliged to continue her personal interactions with Watson to maintain a functioning professional relationship. K.D. found it easier to put up with the momentary discomfort and appease Watson by engaging with him instead of having him spin "out of control" and taking days or weeks to resettle their professional relationship.

## A. Events Leading Up to K.D. Reporting Watson

In September 2021, Watson, K.D, and Councilmember S.A. went to a work conference in Sacramento. One evening, they went to dinner and shared a bottle of wine, which they did not finish. While in an Uber back to their hotel, Watson asked K.D. where they would drink the rest of the wine bottle. K.D. said she was tired and wanted to go to bed. Watson persisted and kept insisting she drink the rest of the bottle with him, until K.D. raised

3

her voice and demanded he stop asking. S.A. was riding in the front of the Uber while Watson and K.D. were in the back and witnessed this entire interaction. Once at the hotel, they all went back to their own rooms.

After the conference, S.A. asked K.D. if she was okay with Watson's obsessive behavior and expressed her concern about the situation. K.D. broke down and disclosed that she had been dealing with this for almost two years and she couldn't control his harassing behavior on her own. K.D. reported Watson for sexual harassment and workplace violence.

## B. City's Petition for Workplace Violence Restraining Order

In October 2021, the city attorney spoke to Watson about the need for an independent investigation. She explained to Watson that because he was an elected official he could not be placed on leave during the investigation, therefore he had to voluntarily agree not to contact K.D. Watson did not deny the allegations and voluntarily resigned as mayor. Shortly after, Watson entered a thirty-day residential rehabilitation program.

After Watson returned from rehab, he went to City Hall, barged into K.D.'s office, interrupted an ongoing meeting, and demanded to talk to her. Watson told K.D. that he learned he had an addictive personality and explained that he was addicted to her. After that interaction, the City directed Watson to communicate with the assistant city manager to prevent him from contacting K.D. Watson challenged the City's authority to put the protocols in place and displayed hostility towards the city attorney and assistant city manager for their role in limiting his interactions with K.D.

In April 2022, an independent investigator issued a report sustaining the allegations by K.D., finding Watson abused his power as a council member and that his conduct was motivated by his romantic interest in K.D.

4

A special city council meeting was held in May 2022 to discuss the report and how to respond to it.

Watson's behavior at the May 2022 meeting caused K.D. to be very concerned for her safety going forward. At the meeting, Watson admitted the allegations but blamed K.D. for his conduct. During public comments, Watson thanked the speakers who suggested he should resign in a brazen and arrogant manner. At the end of the meeting, Watson made a statement where he created a fictitious narrative of the experience and said he would consider resigning if K.D. took responsibility for her role in their relationship. At that moment K.D. realized Watson had absolutely no remorse and recognized the danger of his unpredictability.

At the conclusion of the meeting, the city council authorized outside counsel to seek a restraining order; removed Watson from various committees; directed Watson to communicate solely through his attorney outside of city council meetings; and restricted all council members' access to the city manager's suite.

## C. Escalation of Watson's Behavior

Watson's behavior continued to escalate after the May 2022 city council meeting. For example, during the June 2022 city council meeting, Watson was aggressive and uncontrolled; he talked loudly and quickly, talked over other councilmembers, and told them to turn off their microphones. The city attorney was concerned by his behavior and texted the police chief in case he would need to intervene. That same month, Watson forwarded a confidential email about an ongoing litigation matter to opposing counsel and in a follow up email asked to be contacted directly on the matter because the city attorney was a liar, not credible, and not to be trusted.

Watson also violated the protocols put in place in the May 2022 city council meeting on multiple occasions. He continued to communicate with staff members outside of city council meetings and accessed the city manager's suite on at least two occasions.

In July 2022, before a city council meeting, Watson gained unauthorized access to the city manager's suite by inputting an electronic key code to open the locked door to the suite. K.D. told Watson he was not allowed there and threatened to call the police. K.D. stood in Watson's way and told him not to touch her, but he pushed her arm out of the way and walked past her. K.D. felt very uncomfortable and noted that she and the staff were fearful of Watson's unpredictability and disregard for the impact of his actions.

A few days later, Watson again accessed the city manager's suite by inputting a key code on a locked door. The City's Information Technology manager was present and determined that Watson used the city manager's key code to open the door. Watson claimed that K.D. shared her key code a year before and was therefore "authorized" to use it. K.D. claimed she never gave Watson her key code. K.D.'s key code was then removed from the doors. In August 2022, Watson again attempted to enter the city manager's suite on at least two other occasions in front of City staff, but the key code did not work, and he was unable to get in.

### D. Petition for a Workplace Violence Restraining Order

In October 2022, the City filed a petition for a Workplace Violence Restraining Order against Watson. The trial court issued a temporary restraining order restricting Watson from contacting K.D., S.A., the assistant city manager, and the city attorney unless it was with respect to his official duties as a council member during city council meetings. After Watson was

served with the temporary restraining order, he turned in three handguns and informed the police chief that he had other guns he could not locate. Three days later, Watson violated the temporary restraining order when he copied S.A. on an email to a constituent. He was arrested the same day.

In Watson's response to the petition, he denied sexually harassing K.D. or creating a hostile work environment, provided justifications for his actions, and stated his belief that he was being targeted and harassed by City staff. He also attached a report from a private investigator he hired that reviewed the report created for the City and cited various errors and issues with the report.

### E. Hearing and Ruling on Workplace Violence Restraining Order

The trial court held a hearing on the City's request for a restraining order in February and March 2023. At that point, Watson was no longer on the city council, but K.D. remained the city manager.

At the hearing, K.D., S.A., the assistant city manager, and the city attorney testified to the need for a permanent restraining order. K.D. expressed a continued concern for her safety. She cited Watson's "complete disregard for the impact of his actions," his continuous violation of boundaries, his unpredictability, his past confessions of blacking out and doing things he could not remember doing, and his lack of taking responsibility for his own actions and blaming her. K.D. also stated that she would feel "pretty uncomfortable and sick" if the restraining order was not made permanent and Watson was allowed to get his guns back. S.A. also expressed a continued need for the restraining order and stated her concern that she would become a target without it.

Similarly, the assistant city manager stated that prior to the temporary restraining order her stomach would drop when Watson came into the office

because he was unpredictable, manipulative, and pushed boundaries. She stated that Watson's demeanor in court showed that he had not changed and reinforced the need for a permanent restraining order, especially now that his power and authority had been taken away. The city attorney also testified that she was concerned by Watson's unpredictability and feared a potential of violence. She stated she was targeted by Watson for her role in starting the harassment inquiry and felt his animosity towards her continued at the hearing. She was also concerned because Watson did not turn in all his guns.

### F. Permanent Workplace Violence Restraining Order

On March 17, 2023, the trial court issued a three-year permanent restraining order prohibiting Watson from contacting K.D. and entering City Hall. The order names S.A., the city attorney, and the assistant city manager as additional protected persons. The court found Watson's stalking behavior warranted the issuance of a permanent restraining order and found clear and convincing evidence that irreparable harm would occur if the restraining order were to expire due to the likelihood his stalking behavior would recur. The court held that Watson no longer being a council member did not necessarily mean that he would not repeat or resume his conduct in the absence of a restraining order. Lastly, the court found the employees' testimony more credible than Watson's.

## II. DISCUSSION

Watson challenges the workplace violence restraining order on three grounds. First, he contends the trial court applied the wrong legal standard by expanding the definition of "safety" under the Act. Second, he argues insufficient evidence supports the court's finding that it was likely similar harm would occur again. Third, he insists the court abused its discretion by including additional protected persons. Alternatively, Watson also argues

8

the scope of the restraining order is overbroad and must be narrowed to protect his constitutional rights.  We disagree.

## A. Legal Principles and Standard of Review

"Section 527.6 authorizes a person who has suffered harassment to obtain an injunction to prevent further harassment.  Section 527.8, subdivision (a) provides the same right to an employer:  'Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an order after hearing on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer.'  '[I]njunctive proceedings under section 527.8 are intended to parallel those under section 527.6, which are procedurally truncated, expedited, and intended to provide quick relief to victims of civil harassment.' "  (*CSV Hospitality Management LLC v. Lucas* (2022) 84 Cal.App.5th 117, 122.)

"To obtain a workplace violence restraining order, an employer must prove its employee has suffered unlawful violence or a credible threat of violence from an individual in the workplace.  (§ 527.8, subds. (a), (e).)  The employer 'must establish by clear and convincing evidence not only that [the individual] engaged in unlawful violence or made credible threats of violence, but also that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future.'  [Citations.]  '[T]he requirement of establishing the reasonable probability wrongful acts, or simply unlawful violence, will occur in the future guarantees that injunctive relief will be issued to prevent future harm instead of punishing past completed acts.' "

9

(*CSV Hospitality Management LLC v. Lucas, supra,* 84 Cal.App.5th at pp. 122–123.)

A restraining order issued under section 527.8 is ordinarily reviewed for substantial evidence. (*Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323 (*Rafat*).) " 'When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*Ibid.*)

## B. *Safety Includes Emotional and Psychological Safety*

Watson argues the trial court's broad interpretation of "safety" to include emotional and psychological safety improperly expands section 527.8. We are not persuaded.

As used in the Act, unlawful violence is defined as "any assault or battery, or stalking" as prohibited in Penal Code section 646.9. (§ 527.8, subd. (b)(8).) Stalking, as relevant here, is defined as willfully and maliciously harassing another person and making a credible threat with the intent to place that person in reasonable fear for their safety. (Pen. Code, § 646.9, subd. (a).)

To harass means to engage in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. (Pen. Code, § 646.9, subd. (e).) A course of conduct, in turn, means "two or more acts

10

occurring over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (f).)  Similarly, a credible threat means a verbal or written threat, or a threat implied by a pattern of conduct, or a combination of statements and conduct, made with the intent to place the targeted person in reasonable fear for their safety and made with the apparent ability to carry out the threat.  (*Id.*, subd. (g).)

Although "safety" is not defined in section 527.8 or Penal Code section 646.9, it is a "widely and commonly" used term and has a "clear and understandable dictionary definition."  (*People v. Borrelli* (2000) 77 Cal.App.4th 703, 721, internal quotations marks omitted.)  In *People v. Borrelli*, the court quoted the dictionary definition of safety as the "[c]ondition of being safe; freedom from danger or hazard" and the "[q]uality of being devoid of whatever exposes one to danger or harm; safeness." (*Ibid.*, internal quotations marks omitted.)  Based on that definition, the *Borrelli* court understood safety to include emotional and psychological safety, as well as physical safety, when interpreting Penal Code section 646.9.  (*People v. Borrelli*, *supra*, 77 Cal.App.4th at p. 719; see also *People v. Zavala* (2005) 130 Cal.App.4th 758, 767.)

Additionally, section 527.8's definition of credible threat of violence uses the term safety in a similar manner to Penal Code section 646.9.  A " '[c]redible threat of violence' is a knowing and willful statement or course of conduct that would place a *reasonable person in fear for their safety. . .* , and that serves no legitimate purpose."  (§ 527.8, subd. (b)(2), italics added.)  A broad definition of safety is supported by the case law interpreting Penal Code section 646.9 and the use of similar language in section 527.8.  Thus, we find no error in the trial court's definition of safety to include emotional and psychological safety.

11

### 1. *Substantial Evidence of Stalking Behavior*

Furthermore, we find substantial evidence supports the trial court's conclusion that Watson's stalking behavior justified the permanent restraining order.

Over the course of two years, Watson repeatedly harassed K.D. He used his position as mayor to manipulate her to give more of her time to him, particularly outside of work hours; he would get upset when she didn't respond to his text messages; he would show up at her office unannounced and ask for hugs that became too long and creepy; and K.D. felt she could not say no to his requests. This conduct seriously alarmed, annoyed, tormented, and terrorized K.D. and served no legitimate purpose because much of it was not related to work matters and occurred outside of work hours. (Pen. Code, § 646.9, subd. (e).)

Watson threatened K.D.'s job whenever she tried to establish boundaries for his obsessive behavior. Plus, he failed to voluntarily comply with not contacting K.D. during the City's investigation of the allegations, he entered the city manager's suite multiple times after his access was revoked, and he was hostile towards the city attorney, assistant city manager, and A.S. for their role in preventing him from spending time with K.D. Further, after returning from rehab, Watson told K.D. that he was addicted to her. Thus, the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that Watson's statements and conduct placed K.D. in reasonable fear for her safety. (*Rafat*, *supra*, 82 Cal.App.5th at p. 323; Pen. Code, § 646.9, subd. (g).)

### C. *Likelihood Unlawful Violence Will Recur*

Watson argues there is no substantial evidence that his behavior towards K.D. will recur because he is no longer a council member and cannot

12

continue the behavior that led the City to seek a restraining order. Additionally, he suggests the City waited too long to file the petition, resulting in "stale" allegations because most of the allegations occurred prior to October 2021 and at the time of the filing of the petition Watson had demonstrated he could control his behavior. We disagree.

Changed circumstances at the time of the hearing *may* render a restraining order unnecessary and justify its denial. (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333 (*Scripps*).) Here, however, substantial evidence supports the court's decision to grant a permanent restraining order despite Watson's alleged changed circumstances.

The record shows that Watson tends to push boundaries and flout the City's authority. For example, once Watson returned from his residential rehabilitation program, he immediately went to K.D.'s office and demanded a meeting with her despite being told not to interact with K.D. while the investigation was underway and her being in the middle of a meeting. Similarly, Watson violated the protocols put in place in May 2022 to limit his interactions with K.D. and other staff on multiple occasions. He had unauthorized access to the city manager's suite by using K.D.'s key code without permission. Moreover, Watson did not comply with the temporary restraining order. Thus, "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that" Watson's stalking behavior was likely to recur without a restraining order. (*Rafat*, *supra*, 82 Cal.App.5th at p. 323.)

Watson's reliance on *Scripps*, *supra*, 72 Cal.App.4th 324 is inapposite. In *Scripps*, defendant assaulted and battered a staff member at his mother's hospital facility. (*Id.* at p. 328.) The trial court granted a temporary restraining order under section 527.8 and vacated it four days later based on

defendant's express representation he would stay away from the facility. (*Scripps*, at p. 336.) Defendant made no threats of violence and did not cause any violence when his mother was readmitted as a patient at the facility. (*Ibid.*) Thereafter, defendant's mother changed her insurance making it unlikely she would return to the facility as a patient. (*Ibid.*) Under those circumstances, the *Scripps* court reversed the trial court's grant of a permanent restraining order on the grounds that there was no reasonable likelihood that the acts of violence would reoccur. (*Ibid.*)

Unlike *Scripps* which involved a one-time incident, in this case, there is evidence that Watson's stalking behavior occurred over a two-year period and is likely to recur without a restraining order. Watson continues to be a resident of Arcata. As a resident he is entitled to participate in City government and in that capacity may interact with K.D. and other City employees. In fact, he complains that the permanent restraining order would limit him from engaging with City employees "on any topic." Thus, Watson implies a continued desire to have contact with City employees. Also, despite losing the election for his seat on the city council, there is no indication that he cannot run again in the future. Additionally, within days of its issuance, Watson was arrested for violating the temporary restraining order, illustrating he could not in fact control his behavior. Thus, Watson's conduct falls outside the realm of *Scripps*.

Given the extensive evidence of Watson's obsessive conduct, his repeated tendency to push boundaries and his admission to being "addicted" to K.D., substantial evidence supports the finding of a reasonable likelihood the stalking will recur.

### D. Additional Protected Persons

Watson argues the trial court abused its discretion by including the other protected parties on the restraining order because his conduct and interactions with them did not create a credible threat of violence. We disagree for two reasons. First, Watson had multiple interactions with each employee and engaged in a course of conduct that resulted in the employees fearing for their safety. Second, section 527.8 subdivisions (a) and (d) allow the court, on a showing of good cause, to exercise its discretion to include in the restraining order "any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer." The court need only find unlawful violence or a credible threat of violence against one employee, here K.D., and may then exercise its discretion, on a showing of good cause, to include other employees in the protective order without a separate finding of unlawful violence or credible threat of violence.[2]

In this situation, we do not find the court abused its discretion by including the other protected parties in the restraining order.

### E. Constitutional Rights

Watson argues the restraining order is overbroad and violates his rights to free speech, freedom of association, and civic engagement because he is no longer on the city council and is restricted from entering City Hall and

---

[2] Watson argues his interactions with the additional protected parties was for the legitimate purpose of carrying out his duties as a council member and the trial court should not have considered such actions in granting the restraining order. Because the court did not need to make a separate finding of a credible threat of violence to include the additional protected parties in the restraining order, this argument is inapt. To the extent this argument suggests the trial court relied on improper evidence to grant the restraining order, we found substantial evidence supporting the court's decision, without relying on Watson's conduct in city council meetings. See Sections II.B and C.

precluded from engaging with the protected employees on any topic. Watson did not contend with any specificity—either in the trial court or in his appellate briefing—how the injunction could be more limited and still accomplish its objective. Therefore, we find Watson forfeited this argument. (*San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 579.)

Even if the issue were preserved, we would reject it on the merits. A workplace violence restraining order cannot prohibit speech or other activities that are constitutionally protected. (§ 527.8, subd. (c).) The right to free speech, however, is not absolute or unlimited. (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 536.) Here, having affirmed the trial court's finding of unlawful violence and a credible threat of violence towards an employee, "that speech is not constitutionally protected and an injunction is appropriate." (*Id.* at p. 537.)

While the restraining order prevents Watson from entering City Hall and engaging with the protected parties, it does not prevent Watson from civic engagement. An injunction restraining speech must be "sufficiently narrowly tailored to achieve the expressed governmental interests." (*Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1995) 10 Cal.4th 1009, 1015.) First, all city council meetings are held on Zoom and Watson may view the meetings and make public comments remotely. Second, the scope of the restraining order is appropriate because the "aim of the order is to prevent harm of the nature suggested by the threat." (*City of San Jose v. Garbett, supra,* 190 Cal.App.4th at p. 545.) By preventing Watson from engaging with the protected parties on any topic, the court sought to prevent Watson's manipulation and psychological and emotional abuse of those employees.

Lastly, Watson provides no argument for how his right to freedom of association is impinged by the restraining order. Therefore, we find Watson

waived this argument.  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

## III.  DISPOSITION

The judgment is affirmed.  Costs are awarded to the City.  (Cal. Rules of Court, rule 8.278(a)(2).)

LANGHORNE WILSON, J.


WE CONCUR:


HUMES, P. J.


BANKE, J.


A167819
*City of Arcata v. Watson*